**WENDY HONG WU a/k/a Hong Wu and Arthur Lin, Plaintiffs,**

**v.**

**DUNKIN' DONUTS, INC., Turnway Donuts, Inc., Rick Yuan, Jessie Pan, and York Kissena Realty, Inc., Defendants.**

**No. 98–CV–3020 ARR.**

United States District Court, E.D. New York.

June 14, 2000.

Madeline Lee Bryer, P.C., New York, NY, for Plaintiffs.

Christopher Kendric, Ahmuty, Demers & McManus, Albertson, NY, for Dunkin' Donuts.

Alice Spitz, Molod, Spitz, Desantis & Stark, P.C., New York, NY, for York Kissena.

Robert H. Goldberg, Goldberg & Carlton, P.C., New York, NY, for Turnway Donuts, Rick Yuan, and Jessie Phan.

## OPINION AND ORDER

ROSS, District Judge.

This case addresses whether a franchisor may be held liable under New York law for an attack by third parties on an employee of its franchisee. In the early morning hours of May 25, 1999, Wendy Hong Wu was working alone at a twenty-four hour donut store owned by defendant Turnway Donuts, Inc. ("Turnway"), under a franchise agreement with defendant Dunkin' Donuts, Inc. ("Dunkin' Donuts" or "DD"). Two teenagers entered the store, gained access to the employee area behind the counter, and brutally attacked and raped Ms. Wu. Ms. Wu and her husband, Arthur Lin, allege, among other things, that the attack resulted in part from the vicarious and direct negligence of Dunkin' Donuts.[1] Dunkin' Donuts moves for sum-

---

1. Plaintiffs also name as defendants in this action Turnway, Rick Yuan and Jessie Phan, employees of Turnway, and York Kissena Realty, Inc. ("York Kissena"), the owner of the building in which the donut store is located. Pursuant to a stipulation dated March 5, 1999, plaintiffs discontinued their action against Turnway and its employees Rick Yuan and Jessie Phan. York Kissena has also moved for summary judgment against plaintiffs. By separate opinion and order dated June 9, 2000, the court grants York Kissena's motion.

mary judgment. There is no evidence in the record of this case that Dunkin' Donuts exercised actual control over the security measures taken by its franchisee Turnway or that Ms. Wu relied on any preventive actions taken by Dunkin' Donuts. The issue, then, is whether under New York law a franchisor's making of recommendations concerning security matters to its franchisees renders the franchisor legally responsible for ensuring the safety of its franchisees' employees. For the reasons stated below, the court concludes that it does not.

## BACKGROUND

Except as otherwise indicated, the following facts are undisputed.

Plaintiffs Wendy Hong Wu and Arthur Lin reside in the state of Maine.

Dunkin' Donuts is a corporation incorporated in the state of Delaware and authorized to do business in and by the State of New York. Turnway is a New York corporation.

On April 23, 1992, Turnway entered into a franchise agreement with DD to operate a donut store at 59 Kissena Boulevard in Queens, New York.[2] Turnway renovated the premises, which had previously housed a furniture store, to facilitate the production and sale of donuts. Between 1992 and 1994, the donut store was robbed at least three times. At some point prior to the incident involving Ms. Wu, Jen Chuan Yin, the then-manager of the store, and Sam Yuan, part owner of the store, arranged for the installation of an alarm system and a plexiglass partition with a locked door between the employee area and the customer area. Turnway also installed in the employee area a phone that did not require money to place a "911" call and a video security camera. At some later point, Turnway removed the customer restroom because the employees found it difficult to keep the restroom clean. According to Mr. Yin, Mr. Yuan, and other Turnway employees involved in making these decisions, Turnway did not seek prior approval from DD for these alterations.

In 1994, DD retained Rolland Trayte as a security consultant for the corporation. Mr. Trayte reviewed materials that had been gathered on crimes in Dunkin' Donuts stores and offered several suggestions to company executives. Beginning in November 1994, DD included a series of articles on safety and security matters written by Mr. Trayte in *Common Grounds*, an internal newsletter that DD distributed to its franchisees, including Turnway.

In April 1995, Turnway placed an advertisement announcing a job opening at the Kissena Boulevard store in *The World Journal*, a Chinese-language newspaper. Ms. Wu replied to the advertisement and interviewed with Jessie Phan, the assistant manager of the store. Ms. Phan hired and trained Ms. Wu. At this time, Ms. Wu's English was quite limited and Ms. Phan spoke to Ms. Wu in Chinese. Ms. Wu usually worked the overnight shift, usually alone. A few weeks after Ms. Wu began, the store was robbed a fourth time. The robbery occurred during a night that Ms. Wu was not working. According to various Turnway employees, Ms. Wu was told about this robbery and was warned not to open either the back door that led to the street or the interior door that separated the employee area from the customer area. According to Ms. Wu, she was never told about this robbery. She also asserts that she never received training in crime pre-

Dunkin' Donuts brought a cross-claim against Turnway, the individual defendants, and York Kissena for indemnification. York and Turnway have both moved for summary judgment on the cross-claim. Because the court grants Dunkin' Donuts' motion for summary judgment against plaintiffs, York Kissena's and Turnway's motions against Dunkin' Donuts on the cross-claim are dismissed as moot.

2. Turnway already operated at least one other Dunkin' Donuts franchise at a different location in Queens.

vention techniques or in handling emergencies.

On May 24, 1995, Ms. Wu was working a double shift beginning at 4:00 p.m. and continuing until 7:00 a.m. the next morning. At about 1:00 a.m. on May 25, two young males entered the store. One vomited on the floor. The other asked Ms. Wu for a mop. Ms. Wu opened the locked door that separated the employee area from the customer area and handed the young man a mop. After cleaning up the mess, the young man knocked again on the glass door and Ms. Wu opened the door to retrieve the mop. The two men brutally attacked Ms. Wu, repeatedly raping her and slashing her with a knife. Ms. Wu did not attempt to sound the alarm system or to use the free phone to call 911. According to an unsigned, unsworn letter from a security expert retained by the plaintiffs, the alarm system was not working and there was no video-tape in the security camera at the time the attack occurred.

This action followed. Ms. Wu claims that the defendants breached their duty to provide reasonable security and to protect those lawfully on the property from foreseeable criminal activity (first cause of action); made material misrepresentations to Ms. Wu concerning the safety of the store in general and the night shift in particular (second cause of action); intentionally caused emotional distress through these actions (third cause of action); and deprived Mr. Lin of his wife's company, comfort, society, and companionship (fourth cause of action). *See* Amended Complaint, attached as Exh. B to Affidavit of Christopher Kendric in Support of DD's Motion for Summary Judgment ("Kendric Aff.").

## DISCUSSION

### 1. *The Standard for Summary Judgment*

In ruling on a motion for summary judgment, judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists," *Gallo v. Prudential Residential Services, L.P.*, 22 F.3d 1219, 1223 (2d Cir. 1994), but "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "On summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion," *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), but the non-moving party "must do more than show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In making the necessary showing, "[c]onclusory allegations [by the non-moving party] will not suffice to create a genuine issue." *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990). A "genuine" issue is one that could be decided in favor of the non-moving party based on the evidence by a reasonable jury. *Liberty Lobby*, at 248, 106 S.Ct. at 2510. The role of the court in deciding a motion for summary judgment is not to decide issues of fact, but only to determine whether or not they exist. *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir.1991).

### II. *Negligent Provision of Security*

Plaintiffs assert three different rationales for their claim that Dunkin' Donuts is liable for failing to provide adequate security to Ms. Wu: first, that Dunkin' Donuts is vicariously liable for Turnway's allegedly negligent provision of security;

second, that DD is directly liable under an assumed duty theory; and third, that DD owes Ms. Wu a special and non-delegable duty by virtue of DD's requirement that the donut store remain open 24 hours a day.

### A. *Vicarious Liability*

■ Plaintiffs claim that DD should be held vicariously liable for Turnway's allegedly negligent provision of security. In deciding whether a franchisor may be held vicariously liable for acts of its franchisees, courts determine whether the franchisor controls the day-to-day operations of the franchisee, and more specifically whether the franchisor exercises a considerable degree of control over the instrumentality at issue in a given case. *See, e.g., Schoenwandt v. Jamfro Corp.*, 261 A.D.2d 117, 689 N.Y.S.2d 461 (1999) (summary judgment appropriate where relationship is "merely franchisor-franchisee" and there is no showing that franchisor "exercised complete domination and control of [franchisee's] daily operations or [that] such control resulted in plaintiff's injury"); *see also Helmchen v. White Hen Pantry*, 685 N.E.2d 180, 182 (Ind.Ct.App.1997) (reviewing case law from several jurisdictions raising similar issues and concluding the relevant inquiry is "whether there is a genuine issue of material fact as to the extent the [franchisor] controlled security measures at its convenience stores").

New York courts have granted summary judgment in favor of franchisors of restaurants and convenience stores in several recent cases in which plaintiffs claimed that the franchisor was vicariously liable for the negligence of a franchisee. In each case, the court concluded that the franchisor did not exercise sufficient control over the day-to-day operations of the franchisee to give rise to a legal duty. *See, e.g., Schoenwandt*, 261 A.D.2d at 117, 689 N.Y.S.2d at 462 (reversing lower court decision denying summary judgment to Burger King Corporation on the ground

that Burger King's right to reenter the premises and terminate the agreement did not constitute a basis for imposing liability); *Lewis v. McDonald's Corp.*, 245 A.D.2d 270, 272, 664 N.Y.S.2d 477, 479 (1997) (affirming without discussion lower court's grant of summary judgment to McDonald's in case brought by patrons of McDonald's franchisee assaulted in parking lot); *Andreula v. Steinway Baraqafood Corp.*, 243 A.D.2d 596, 668 N.Y.S.2d 891 (2d Dept. 1997) (reversing lower court's denial of summary judgment motion brought by Dunkin' Donuts in case arising from an accident involving a delivery truck operated by employee of DD franchisee on ground that DD did not hire the driver, maintain control over the franchisee's hiring practices, or control this aspect of the franchisee's business); *Dalzell v. McDonald's Corp.*, 220 A.D.2d 638, 632 N.Y.S.2d 635 (2d Dept.1995) (affirming grant of summary judgment to McDonald's in case arising from sexual assault of franchisee's employee but largely basing the decision on analysis of McDonald's obligations as a landowner rather than a franchisor); *see also Hatcher v. Augustus*, 956 F.Supp. 387 (E.D.N.Y.1997) (granting summary judgment to 7–11 franchisor in suit brought by employee of 7–11 store alleging religious discrimination), *Perry v. Burger King Corp.*, 924 F.Supp. 548 (S.D.N.Y.1996) (granting summary judgment to franchisor in suit brought by customer of franchisee alleging racial discrimination). In several similar cases alleging injuries that occurred at, or were otherwise related to, gas stations, New York courts have likewise granted summary judgment to franchisor oil companies. *See Baker v. Getty Oil Co.*, 242 A.D.2d 644, 663 N.Y.S.2d 40 (2d Dept. 1997), *appeal denied* 93 N.Y.2d 801, 687 N.Y.S.2d 625, 710 N.E.2d 272 (1999); *Norton v. Cohen*, 248 A.D.2d 519, 670 N.Y.S.2d 49 (2d Dept.1998); *Ahmad v. Getty Petroleum Corp.*, 217 A.D.2d 600, 629 N.Y.S.2d 779 (2d Dept.1995); *Ross v. Mobil Oil Corp.*, 173 A.D.2d 361, 569 N.Y.S.2d 729 (1st Dept.1991); *Balsam v. Delma Eng'g*

*Corp.,* 139 A.D.2d 292, 532 N.Y.S.2d 105 (1st Dept.1988) (all granting or affirming summary judgment or directed verdict for franchisor).

In a few (less recent) cases, courts denied summary judgment on a showing that there were material disputed facts bearing on the extent of control exercised by the franchisor. *See O'Boyle v. Avis Rent–A–Car Sys., Inc.,* 78 A.D.2d 431, 435 N.Y.S.2d 296 (2d Dept.1981) (affirming jury verdict against Avis as well as franchisee in action arising out of an automobile accident caused by an unlicenced, underage employee who drove a car off the franchisee's premises, where testimony established that Avis representatives had frequently observed underage employees driving company vehicles around the premises); *see also Vaughn v. Columbia Sussex Corp.,* 91–CV–1629, 1992 WL 18843 (S.D.N.Y. Jan.28, 1992) (denying under New York law a summary judgment motion brought by Holiday Inn in an action arising out of plaintiff's slip on a wet floor in a franchisee's lobby on the ground that Holiday Inn was involved in training of hotel employees and construction of building, and that it reserved a right to inspect and order upgrading at any time); *Hilton v. Holiday Inns, Inc.,* 87–CV–1958, 1990 WL 113133 (S.D.N.Y. Aug.1, 1990) (denying under New York law a summary judgment motion brought by Holiday Inn in an action claiming damages concerning an accident involving a shuttle bus operated by franchisee's employee on the ground that Holiday Inn required that its franchisees comply with the company's standards manual).

In all of the cases cited above, the courts recognize that the outcome requires analysis of the extent of control exercised by the franchisor over the franchisee. Unfortunately, however, the decisions include only brief descriptions of the underlying facts supporting each court's conclusion. They thus offer little aid to this and other courts faced with determining whether the degree of control exercised by a franchisor in a given situation gives rise to liability under New York law. Accordingly, although the large number of cases granting summary judgment to franchisors suggests that New York courts tend to define franchisor liability in such situations narrowly, the court looks, as have the parties, to caselaw from non-New York jurisdictions in assessing the significance of the facts alleged in this case.

Several carefully-reasoned decisions by courts in other states address this issue. As in New York, the franchisor typically is found to be vicariously liable only in situations where it exercised considerable control over the franchisee and the specific instrumentality at issue in a given case. Most courts have found that retaining a right to enforce standards or to terminate an agreement for failure to meet standards is not sufficient control. A right to reenter premises and inspect also generally does not give rise to a legal duty. For example, the Supreme Court of Washington recently issued a decision en banc considering a claim brought by the estates of employees of a Burger King franchisee who were murdered during a robbery of the restaurant. *See Folsom v. Burger King,* 135 Wash.2d 658, 958 P.2d 301 (1998) (en banc). The court noted that Burger King reserved the right to enforce its standards and required that its franchisees comply with the guidelines included in Burger King's manual. The court observed, however, that the franchise agreement specifically stated that the franchisee was an independent contractor, that Burger King had no control over the terms and conditions offered to the franchisee's employees, and that Burger King had not "retained control over the security of the franchise restaurant." *Folsom v. Burger King,* 958 P.2d at 308–09. Accordingly, notwithstanding the considerable control Burger King retained to ensure "the uniformity of the Burger King system," *id.* at 309, the court concluded that Burger King

did not owe a legal duty to the plaintiffs. *See id.*

In a case brought by an employee of a McDonald's franchisee who was similarly injured in a criminal assault by third parties, the Supreme Court of Iowa also found that the franchisor did not owe the plaintiff a legal duty. *See Hoffnagle v. McDonald's Corp.*, 522 N.W.2d 808 (Iowa 1994). The court recognized that McDonald's required its franchisees to use business manuals developed by McDonald's and to attend training programs at its central training center. McDonald's also reserved a right to inspect restaurants to ensure that its franchisees operated their establishments in accordance with the company's standards. However, as in *Folsom* (and almost all other franchise situations), the franchisee had discretion to hire, fire, train, and discipline its own employees. The court concluded that "McDonald's authority is no more than the authority to insure 'the uniformity and standardization of products and services offered by a [franchisee's] restaurant'" and that such authority was insufficient to give rise to a legal duty. *Hoffnagle*, 522 N.W.2d at 813 (quoting *Little v. Howard Johnson Co.*, 183 Mich.App. 675, 455 N.W.2d 390, 394 (1990)); *see also Hayman v. Ramada Inn, Inc.*, 86 N.C.App. 274, 357 S.E.2d 394 (1987) (similar); *Myszkowski v. Penn Stroud Hotel, Inc.*, 430 Pa.Super. 315, 634 A.2d 622 (1993) (similar).

As noted above, the degree of control that the franchisor exercises over its franchisee's security measures is particularly significant. In deciding whether the franchisor's actions give rise to a legal duty, courts typically draw distinctions between *recommendations* and *requirements*. For example, in a case brought by the estate of an employee of a White Hen Pantry ("WHP") franchisee who was abducted from the store, raped, and murdered, an Indiana appeals court affirmed a grant of summary judgment in favor of the franchisor. *See Helmchen v. White Hen Pantry, Inc.*, 685 N.E.2d 180 (Ind.Ct.App.1997).

At the outset, the court reviewed the franchise agreement and found that WHP required that franchisees follow WHP plans for fixtures, equipment, signs, and other display-related materials and that they comply with the standards included in the franchisor's operating manual. Like the *Folsom* and *Hoffnagle* courts, the Indiana court found that these controls were intended to maintain uniformity of appearance and products and were insufficient to create a duty on the part of the franchisor to provide a secure workplace for its franchisees' employees and customers. *See id.* at 182. The court then considered the nature and significance of the franchisor's involvement in the security of its franchisees. WHP's operation manual included a section on robberies. The company also had a "director of loss prevention" who, in correspondence to franchisees, discussed loss prevention strategies, including video surveillance systems, and WHP required franchisees that chose to adopt video security systems to employ certain kinds of equipment. The company did not, however, require that its franchisees use video surveillance at all, and the franchisee at issue in the case did not do so. The court concluded that display the company's efforts to "heighten awareness" and "offer suggestions" regarding security issues to its franchisees, the company was not vicariously liable for the alleged negligence of its franchisee because WHP did not specifically mandate any security measures. *Id.* at 183.

A recent case from a Texas appeals court reached the same conclusion in affirming a directed verdict to the franchisor in a case brought by a customer who was assaulted in a franchisee's parking lot. *See Kelley v. Wurzbach*, 14–97–00557–CV, 1999 WL 33640 (Tex.App.1999). The plaintiff claimed that issues of fact existed because the franchisor, McDonald's, published a security manual, trained franchisee managers and owners in security measures, and sponsored an advertisement promoting its franchisees' 24–hour drive-

through lanes. There was also evidence presented at trial that McDonald's had advised the individual franchisee of crimes at other McDonald's restaurants in the area and described to the franchisee the security measures taken by the other franchisees. The court concluded, however, that the directed verdict entered by the trial court judge was appropriate because, although McDonald's made suggestions and recommendations to its franchisees regarding security, it did not control the security decisions made by the franchisees. *See id.* 1999 WL 33640 at * 6–7.

Although the case law is not uniform,[3] the weight of authority construes franchisor liability narrowly, finding that absent a showing of actual control over the security measures employed by the franchisee, franchisors have no legal duty in such cases. Against this background, the court now turns to the specific relationship between the franchisor and franchisee in this case.

■ The franchise agreement entered into by Dunkin' Donuts and Turnway

(which is a form franchise agreement with a few minor modifications) specifically provides that Turnway, the franchisee, is an independent contractor rather than an agent, employee, servant, joint venturer, or other legal representative of DD. *See* Laudermilk Aff., Exh. D [hereinafter "franchise agreement" or "FA"], ¶ 11–A. The agreement details the duties of each party. DD assists with the launch of new stores by providing a standard site plan, organizing an advertising campaign, and training the franchisee's managers in the DD system. DD then maintains a 'continuing advisory relationship' which includes periodic inspections to determine whether franchisees maintain the store in conformity with the DD standards manual. FA ¶ 3. The franchisee warrants to maintain the premises in conformity with DD's standards and to secure prior written consent for significant interior or exterior alterations. FA ¶ 5. If the franchisee fails to maintain the standards, DD may make necessary repairs at the franchisee's expense or terminate the relationship. Although the control that DD exercises

**3.** In *Holiday Inns, Inc. v. Shelburne,* 576 So.2d 322 (Fla.App.1991), for example, an appellate court in Florida considered a similar case and found that Holiday Inn, as franchisor, could be liable for injuries sustained in a parking lot brawl by two patrons of a bar operated in a Holiday Inn franchisee. The court observed that Holiday Inn required its franchisees to comply with the company's standards manual and to send managers to a safety training program. Holiday Inn also published a loss prevention manual and retained a right to reenter the premises. Although this level of involvement was, at most, equivalent to the degree of involvement exercised by the franchisors in the *Helmchen, Kelley, Folsom,* and *Hoffnagle* cases, the court concluded that Holiday Inn had retained control over the franchisee's security programs and thus could be liable.

Plaintiffs also identify two cases from Illinois finding that where the franchisor suggested various security measures, conducted reviews of franchisee security, and, in one case, required that franchisees employ time-delay safes, the franchisor voluntarily assumed a duty to provide security that it subsequently breached. *See Decker v. Domino's Pizza, Inc.,* 268 Ill.App.3d 521, 205 Ill.Dec.

959, 644 N.E.2d 515 (1994); *Martin v. McDonald's Corp.,* 213 Ill.App.3d 487, 157 Ill. Dec. 609, 572 N.E.2d 1073 (1991). However, since liability in both these cases was premised on an assumed duty theory—which, as discussed below, Ms. Wu cannot establish because she has not shown reliance—neither actually determines whether such a degree of control would be sufficient to establish vicarious liability.

In another variation, a California appeals court reversed a grant of summary judgment issued in favor of Southland Corporation, the franchisor of 7–11 stores, on the ground that the foreseeability of the criminal action was a fact issue for a jury. *See Cohen v. Southland Corp.,* 157 Cal.App.3d 130, 203 Cal.Rptr. 572 (1984). Southland was the owner as well as the franchisor of the store and liability was premised on Southland's duties as a landowner. Accordingly, the analysis focuses on foreseeability rather than the amount of control that Southland exercised over its franchisee. Since York Kissena Realty, rather than DD, owned the property where the donut store was located, the reasoning applied in the *Southland* case is inapposite to Ms. Wu's claim against Dunkin' Donuts.

under the franchise agreement is considerable, it is primarily designed to maintain uniform appearance among its franchisees and uniform quality among their products and services to protect and enhance the value of the Dunkin' Donuts trademark. Turnway remains solely responsible for hiring, firing, and training its employees and for making all day-to-day decisions necessary to run the business.

Plaintiffs do not seem to dispute that the general control that DD exercises under the franchise agreement, which is equivalent to that exercised by the franchisors in the *Folsom, Hoffnagle, Hayman, Myszkowski,* and *Helmchen* cases, is insufficient in itself to create vicarious liability.[4] They point, however, to three particular practices which they argue show that DD retained control over security measures giving rise to a legal duty. Specifically, they argue that DD (1) controlled the purchase of security equipment and "require[d]" a functioning alarm system; (2) "require[d]" a site plan that revealed to passers-by that Ms. Wu was alone; and (3) required that Turnway remain open 24 hours a day. *See* Plaintiff's Declaration in Opposition to DD's Motion for Summary Judgment ("Pl. Opp. to DD"), at 28.

■ Turning first to the third asserted indicium of control, it is undisputed that the franchise agreement provided that the Turnway store would remain open 24 hours a day. DD's requirement that the donut store remain open through the night may well have heightened the need for adequate security. The provision does not, however, mandate specific security measures or otherwise control or limit Turnway's response to this increased risk.[5] Accordingly, it cannot be grounds for an assertion of vicarious liability. *Cf. Kelley,* 1999 WL 33640 (rejecting plaintiff's claim that franchisor's sponsorship of a promotion of franchisees' 24–hour drive-through lanes gave rise to liability).

■ Turning next to plaintiffs' first claimed indicium of control, that claim fails for lack of evidence. Plaintiffs have provided no competent evidentiary support for their assertion that DD "required" that Turnway install a working alarm system or take other security measures. To the contrary, the undisputed evidence in the record demonstrates that DD merely made security equipment available for purchase and suggested that alarm systems and other burglary prevention techniques were important, Kevin Golden, DD's former equipment manager, testified that he prepared a list of recommended equipment for franchisees and that in 1988 this list contained four items that related to security: a lockable safe, a cash box, a convex mirror, and a pushbar alarm. *See* Pl. Opp. to DD, Exh. H (Golden Dep.), at 27–28, also available at Kendric Aff., Exh. O. The court notes that this list was compiled some four years before Turnway opened the Kissena Boulevard store. Plaintiffs have provided no evidence that an equipment list existed at the relevant time, much less that these or similar items were included on any such list. Further, al-

4. As noted, the pertinent terms and conditions of the franchise agreement in this case are very similar to those of the franchise agreements in the *Folsom* case, granting summary judgment to Burger King, and the *Hoffnagle* case, granting summary judgment to McDonald's. As also noted, recent New York cases raising similar issues also grant summary judgment to Burger King, *see Scheonwandt,* 26 1 A.D.2d at 117, 689 N.Y.S.2d at 462, and McDonald's, *see Lewis,* 245 A.D.2d at 272, 664 N.Y.S.2d at 479, *Dalzell,* 220 A.D.2d at 638, 632 N.Y.S.2d at 635. Although the New York decisions do not describe the franchise agreements in detail, there is no reason to believe that the agreements differed materially from the Burger King and McDonald's franchise agreements described in the *Folsom* and *Hoffnagle* cases. If the agreements were similar, these New York courts have likewise determined that a franchisor's right to enforce standards designed to maintain uniform appearance and services is insufficient to give rise to vicarious liability in such suits.

5. Nor, as explained below, is it sufficient to support plaintiffs' allegation that DD owed Ms. Wu a special duty.

though plaintiffs ignore the context in which these statements were made, Mr. Golden's responses to subsequent questions made clear that the list merely suggested equipment that was "available to order if [the franchisee] so chose." *Id.* at 29. There is thus no evidence that DD required the purchase of security equipment.

Moreover, even assuming a similar list remained available at the time that Turnway opened and operated the Kissena store, the evidence is uncontradicted that Turnway did not take advantage of the offered services. Rather, without informing DD of the robberies or seeking prior approval for the alterations, Turnway hired a security consultant on its own and installed its own plexiglass partition, alarm system, and video camera. *See* Kendric Aff., Exh. I (S. Yuan Dep.), at 99, 103, 123 (Sam Yuan, part owner of Turnway store, did not remember informing DD that Turnway intended to install a partition and did not remember anyone from DD asking about the partition), at 129 (Sam Yuan did not advise DD of the video surveillance equipment that Turnway proposed to install and did not receive DD's approval to install it), 134 (Sam Yuan did not recall informing DD that an alarm system had been installed). Although DD inspectors subsequently observed that these alterations had been made, there is no indication that they evaluated the necessity or sufficiency of such security measures. *See* Kendric Aff., Exh. II (DeLuca Dep.), at 81 (Warren DeLuca, DD business consultant for the geographic area including the Kissena Boulevard store, stated that DD inspected for "quality, service, [and] cleanliness, the three issues"); Exh. D (R. Yuan Dep.), at 98 (Rick Yuan, vice-president of Turnway and former manager of the Kissena Boulevard store, never spoke about shop security with anyone from Dunkin' Donuts prior to 1997); Exh. F (Phan Dep.), at 79 (Phan, then assistant manager of the Kissena Boulevard store, recalled that DD inspector knew about the alarm and video system and asked at what hour the partition was opened and closed but did not ask further questions about security). DD's simply providing a list of suggested—but not required—security items does not support plaintiffs' contention that DD retained or assumed control of the security of its franchisees. *Cf. Helmchen,* 685 N.E.2d at 183 (franchisor that allowed franchisees to choose whether to use video surveillance assumed no duty even though franchisor mandated which video surveillance system, if any, would be used).

Nor does the record support plaintiffs' repeated assertion that DD "mandated" or "required" that Turnway employ a site plan allegedly making it evident to persons outside the store that Ms. Wu was alone. Neither party has submitted evidence as to the lighting plan of Turnway's donut store or the clarity of sight lines from outside (or inside) the store into the employee area. The franchise agreement states that DD will provide the franchisee with its standard site plan. FA ¶ 2–C. The agreement does not, however, explicitly require that franchisees conform with this standard plan, and there is no evidence in the record concerning whether Turnway designed its store according to the specifications of the plan. Also, as noted above, Turnway made several significant interior alterations, including installation of the plexiglass partition and the locked door and removal of the customer restroom, without seeking or receiving DD's prior approval. *See* S. Yuan Dep. at 123 (Sam Yuan did not submit any specifications to DD for approval in connection with the installation of the partition and did not recall being asked by DD about the partition); R. Yuan Dep. at 61–62 (Rick Yuan informed DD of Turnway's plans to remove the restroom but did not believe that he needed DD's prior approval to make the alteration). Of course, in deciding a motion for summary judgment, all reasonable inferences must be drawn in favor of the non-movant, in this case, the plaintiffs. However, since there is no express re-

quirement that franchisees comply with a standard site plan and the undisputed evidence in the record demonstrates that Turnway made material alterations to its interior design without seeking or receiving DD's prior approval, the court finds that no reasonable fact finder could conclude that DD "required" the site plan at issue in this case.[6]

The other security measures that plaintiffs have identified DD's hiring of Mr. Trayte, its subsequent publication in the *Common Grounds* newsletter of Mr. Trayte's articles providing security advice, and the portion of DD's managers' training devoted to security—are similarly merely advisory. The franchisee is responsible for assessing the usefulness of these suggestions and implementing them to the extent it deems appropriate. The "Overview" of the section on shop safety of the managers' training manual states: "You, *the Franchisee or manager* are the key person responsible for detecting unsafe conditions, teaching safe practices to employees and enforcing those practices," and the following pages of the manual are explicitly presented as a " 'Guide to A Franchise Safety *Self-Inspection* Program.' " Laudermilk Aff., Exh. L (*Network Administration Manual,* at 10–2) (emphasis added). The *Common Grounds* articles similarly offer recommendations, not requirements. *See, e.g.,* Laudermilk Aff., Exh. M ("Does Your Shop Have A Fishbowl?", *Common Grounds,* dated Nov. 18, 1994, at 3) ("*Franchisees and shop managers can* apply the visibility concept by implementing what environmental design engineers call the fishbowl effect.")

(emphasis added). As noted above, it is undisputed that DD did not inspect for security. It is similarly agreed that franchisees were not obligated to (and Turnway did not) report robberies or other incidents to DD. *See* DeLuca Dep., at 170–172 (franchisees not required to report robberies); S. Yuan Dep., at 161 (Sam Yuan did not recall reporting a robbery to DD and was not asked to prepare incident reports); Phan Dep., at 75 (Turnway did not have custom or practice of reporting accidents or incidents to DD). Dunkin' Donuts, like the franchisors in *Helmchen* and *Kelley,* merely offered suggestions to its franchisees concerning security.

The possibility, however, that the recommended security measures might have helped protect Ms. Wu highlights a public policy concern that the court believes also counsels against imposing liability on Dunkin' Donuts under the circumstances of this case. Dunkin' Donuts' expressed a laudable desire to assist its franchisees in protecting their employees and customers. Imposing liability on the basis of such advice could discourage franchisors such as DD from taking steps to promote an awareness of security issues among franchisees. By contrast, the relatively narrow definition of liability adopted by the *Helmchen, Kelley,* and other courts discussed above—which requires a showing of control over a franchisee's security measures beyond merely offering recommendations and advice concerning security and imposing standards relating to appearance, products, and services—fosters a franchisor's efforts to assist in ensuring the safety

6. Plaintiffs may be basing their assertion on an article written by Rolland Trayte, DD's security consultant, suggesting that franchisees employ a "fishbowl" arrangement because he apparently believed that clear visibility of the cash register area *increased* employee safety. *See* Laudermilk Aff., Exh. M ("Does Your Shop Have A Fishbowl?", *Common Grounds,* dated Nov. 18, 1994, at 3). Plaintiffs' proposed expert apparently disagrees. *See* Pl. Opp. to DD. Exh. D (unsigned, unsworn letter ostensibly from Harry Smith suggesting that fishbowl arrangement increased risk and should not have been employed without use of additional security measures). Since there is no evidence that anyone at Turnway read Mr. Trayte's article, let alone made modifications on the basis of it, the wisdom of this suggestion is entirely immaterial. (If anything, the fact that Mr. Trayte wrote an article in the newsletter suggesting that franchisees consider implementing a fishbowl design suggests that the standard DD plan did not employ such a configuration.)

of its franchisees' employees and customers. The many New York court decisions granting summary judgment to franchisors in suits brought by employees or customers of franchisees is consistent with a conclusion that New York courts also recognize the value of the policy promoted by defining franchisor liability in such situations narrowly. The court therefore determines that since there is no evidence that DD actually mandated specific security equipment or otherwise controlled the steps taken by its franchisees in general, and Turnway in particular, to protect employees, DD is not vicariously liable for the alleged lapse in security at issue in this case.

### B. *Assumed Duty*

■ Plaintiffs also contend that DD voluntarily assumed a duty to provide and maintain security and that the company was negligent in its execution of this duty. To establish a cause of action for violation of an assumed duty, the plaintiff must show (1) that the plaintiff reasonably relied on the defendant's assumption of a duty and (2) that the defendant's conduct "placed [the] plaintiff in a more vulnerable position than [the] plaintiff would have been in had [the] defendant done nothing." *Heard v. City of New York*, 82 N.Y.2d 66, 72, 623 N.E.2d 541, 544, 603 N.Y.S.2d 414, 417 (1993) (citing *Nallan v. Helmsley–Spear, Inc.*, 50 N.Y.2d 507, 522, 429 N.Y.S.2d 606, 407 N.E.2d 451 (1980)); *see also Tavarez v. Lelakis*, 143 F.3d 744 (2d

Cir.1998) (discussing standard under New York law).

■ Plaintiffs claim that DD voluntarily instituted a company-wide program designed to increase security at its franchisees and then negligently failed to follow through on this commitment. Plaintiffs have, however, failed to make either of the two showings that might give rise to an enforceable duty. That is, they have failed to submit competent proof demonstrating that Ms. Wu relied on DD's security program or that DD's actions increased the risk of harm to Ms. Wu.

Plaintiffs suggest that DD's publication of security advice in the company's internal newsletter, *Common Grounds*, and the alleged release of an announcement that the company had retained Rolland Trayte as a security consultant "establish reliance." Pl. Opp. to DD at 18.[7] This conclusory assertion is not sufficient. First, although plaintiffs provide what appears to be a press release announcing the hiring of Mr. Trayte, *see id.*, Exh. BB, plaintiffs have provided no evidence that this press release was actually disseminated or that it engendered any media coverage of the appointment, let alone that Ms. Wu saw or heard any such news stories and relied on them in choosing to work at the donut store. Nor has Ms. Wu testified or submitted any evidence that she ever read— or knew anything about—*Common Grounds*. Rather, Ms. Wu testified that she did not remember receiving "any in-

---

**7.** Plaintiffs' argument relies heavily on *Martin v. McDonald's Corp.*, 213 Ill.App.3d 487, 157 Ill.Dec. 609, 572 N.E.2d 1073 (1991), and *Decker v. Domino's Pizza*, 268 Ill.App.3d 521, 205 Ill.Dec. 959, 644 N.E.2d 515 (1994), two cases decided under Illinois law. In these cases, appellate courts affirmed judgments entered on jury verdicts finding franchisors liable for injuries to their franchisees' employees on the ground that the franchisors negligently performed a voluntarily assumed duty to provide security. Neither of these decisions makes clear whether there was evidence that the plaintiffs in these cases specifically relied on the defendant's assumption of the duty, probably because reliance is not required un-

der Illinois law. *See Nelson v. Union Wire Rope Corp.*, 31 Ill.2d 69, 199 N.E.2d 769, 780 (1964) ("Defendant's liability for the negligent performance of its [voluntary] undertaking . . . is not limited to such persons as might have relied upon it to act but extends instead to such persons as defendant could reasonably have foreseen would be endangered as the result of negligent performance."). Thus, although these cases might be persuasive in determining whether DD's actions gave rise to a legally enforceable duty, they do not speak to (or in any way lessen) the requirement under New York law that the plaintiff demonstrate reliance.

structional manuals or pamphlets or written training materials, [or] anything in the nature of guidelines or suggestions of how to perform [her] job properly." Wu Dep. at 57–58.

Plaintiffs also argue that Ms. Wu "relied" on the Dunkin' Donuts name and a promise of "excellent working conditions" in answering the employment advertisement that Turnway placed in *The World Journal,* a Chinese-language newspaper. *See* Pl. Opp. to DD at 3, 18 & n.4. Ms. Wu, however, has not testified that she was familiar with, or relied on, Dunkin' Donuts' reputation or any particular language in the advertisement in choosing to apply for the job at the donut shop. Rather, plaintiffs' argument seems to be based on an assumption that the advertisement to which Ms. Wu responded resembled sample employment advertisements that are included in at least one version of the *Network Administration Manual* that DD distributes to franchisees. *See* Pl. Opp. to DD, at 3, 18 n.4 (citing Pl. Opp. to DD. Exh. A). One sample advertisement, described as a "general ad" that can be adapted to a number of positions, suggests promoting the employment position as "a chance to become a member of the Dunkin' Donuts family." Exh. A. The other sample advertisement suggests promising "excellent working conditions." *Id.* Again, the court recognizes that in deciding this motion for summary judgment, all reasonable inferences must be drawn in favor of plaintiffs, the non-movants. Plaintiffs, however, cannot rely on wholly conclusory allegations to defeat a motion for summary judgment. Plaintiffs have not submitted a copy of the advertisement to which Ms. Wu responded. Nor have plaintiffs submitted copies of other advertisements that Turnway has used in the past. Plaintiffs have not even submitted evidence that the sample advertisements included in plaintiffs' Exhibit A were included in the version of the *Network Administration Manual* that was in use (and distributed to Turnway) in the early 1990s. The court therefore finds that there is insufficient evidence for a reasonable fact finder to conclude that Ms. Wu relied on such a representation in choosing to apply for work at the donut store. Since the record is barren of evidence demonstrating reliance, plaintiffs' claim based on a voluntary assumption of duty fails.

## C. *Special Relationship*

Finally, plaintiffs contend that Dunkin' Donuts owes Ms. Wu a special duty because it required that the donut store remain open 24–hours a day, thus creating, according to plaintiffs, a "hazardous condition" that fits within an exception recognized under New York law to the general rule that a principal is not liable for work undertaken by an independent contractor. This argument strains credibility. First, plaintiffs heavily rely on *Longo v. New York City Educational Construction Fund,* 121 Misc.2d 830, 469 N.Y.S.2d 303 (Sup.1983), a case holding that, even absent a contractual relationship, Consolidated Edison could be liable for injuries sustained by the plaintiff in the lobby of his apartment building during an electrical black-out because the injury was foreseeable and the company had specifically intended to provide a benefit to the class of persons that included the plaintiff. Defendants accurately observe that this decision was subsequently overturned on the basis of public policy, since the Supreme Court's holding would give rise to almost limitless liability. *See Longo,* 114 A.D.2d 304, 493 N.Y.S.2d 561 (1st Dept. 1985) (citing *Strauss v. Belle Realty Co.,* 65 N.Y.2d 399, 492 N.Y.S.2d 555, 482 N.E.2d 34 (1985)). More centrally, plaintiffs' argument is flawed because requiring a convenience store to remain open 24–hours a day simply does not meet the definition of a "hazardous activity." The Court of Appeals has defined a "hazardous activity" as one that is "dangerous in spite of all reasonable care" and has noted that typical examples include blasting or working with high tension wires. *Chainani v. Board of Educ.,* 87 N.Y.2d 370, 380, 663

N.E.2d 283, 639 N.Y.S.2d 971 (1995) (quotations omitted). Like driving a school bus, *see Chainani,* operating a convenience store 24–hours a day does not pose the sort of inherent risk for the non-negligent operator that triggers such liability. In fact, plaintiffs' main argument is that DD and Turnway could have—and should have—taken steps to avoid the injuries that occurred. There is also no evidence that DD was in a better position than Turnway to minimize the risk. *See id.* at 381, 639 N.Y.S.2d 971, 663 N.E.2d 283. Rather, the undisputed evidence is that Turnway did not inform DD of the prior robberies and took it upon itself to install the video camera and the plexiglass partition. The requirement that the donut store remain open 24–hours a day does not create a "hazardous condition" as defined by the Court of Appeals and DD is not vicariously liable for Turnway's alleged failure to take adequate precautions.

### III. *Negligent Misrepresentations*

■ Plaintiffs allege that DD made negligent misrepresentations to Ms. Wu about the safety of working at the donut store through its publication of safety advice in *Common Grounds* and through the employment advertisement placed by Turnway, which allegedly promised "excellent working conditions." To state a claim for negligent misrepresentation, a plaintiff must establish that the "defendant had a duty to use reasonable care to impart correct information because of some special relationship between the parties, that the information was incorrect or false, and that the plaintiff reasonably relied upon the information provided." *Grammer v. Turits,* 706 N.Y.S.2d 453 (2d Dept.2000). Here, plaintiffs have failed to demonstrate factual support for any of these elements. First, there is no evidence of a special relationship between the parties, or indeed, that DD ever made any kind of representation directly to Ms. Wu. Second, there is no evidence that the statements identified by plaintiffs were "false." As to

the statements in *Common Grounds,* these columns merely suggested safety measures that franchisees could employ; such advice is not in any way untrue. As to the advertisement, since plaintiffs have not made part of the record on this motion a copy of the actual advertisement viewed by Ms. Wu, there is no way to know what statements it did or did not make or to assess their veracity. Finally, as discussed in reference to plaintiff's assumed duty argument, there is no evidence that Ms. Wu relied on any of these alleged statements. Accordingly, the court grants summary judgment on this claim.

### IV. *Intentional Infliction of Emotional Distress*

■ Although plaintiffs' complaint claims intentional infliction of emotional distress, plaintiffs make no response to DD's contention that this claim fails, suggesting that plaintiffs may intend to abandon the claim. In any case, the court grants summary judgment to DD. To recover for intentional infliction of emotional distress, a party must show (1) extreme or outrageous conduct, (2) with the intent to cause, or in disregard of a substantial probability of causing, severe emotional distress, (3) causal connection between the conduct and the injury, and (4) that the conduct actually resulted in severe emotional distress. *See Howell v. New York Post Co.,* 81 N.Y.2d 115, 121–22, 612 N.E.2d 699, 702, 596 N.Y.S.2d 350, 353 (1993). Liability exists only where the conduct "has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in 'civilized community.' " *Id.* (quoting *Murphy v. American Home Prods. Corp.,* 58 N.Y.2d 293, 303, 448 N.E.2d 86, 90, 461 N.Y.S.2d 232, 236 (1983)). Plaintiffs have alleged merely that DD failed to provide adequate security or to ensure that Turnway did so. Although certainly the attack itself was brutal and shocking, the record is devoid of

any evidence that DD's actions, or lack thereof, might be deemed to reach the level of extreme outrageousness required by New York law.

### V. *Loss of Consortium*

Mr. Lin's claim of loss of consortium against DD is predicated on the theory that DD is liable for Ms. Wu's injuries. Since that theory fails, Mr. Lin's loss of consortium claim fails as well. *See June v. Laris,* 158 Misc.2d 881, 886, 602 N.Y.S.2d 778, 782 (Sup.1993) ("[The] derivative claim for loss of consortium draws its life from the primary claim and cannot stand by itself if the underlying action is meritless."), *aff'd* 205 A.D.2d 166, 618 N.Y.S.2d 138 (3rd Dept.1994).

### CONCLUSION

For the reasons stated above, defendant Dunkin' Donuts motion for summary judgment against plaintiffs is GRANTED. By separate opinion and order dated June 9, 2000, the court grants defendant York Kissena's motion for summary judgment against plaintiffs. Defendants Turnway and York Kissena's motions for summary judgment against Dunkin' Donuts' on its cross-claim are dismissed as moot. Since all pending claims are resolved, this action is dismissed.

The Clerk of Court is instructed to enter judgment accordingly.

SO ORDERED.