Rockingham
No. 2006-151

DEBORAH A. DENT, ADMINISTRATRIX OF THE ESTATES OF HELEN M. FOLLONI AND LAWRENCE F. FOLLONI

v.

EXETER HOSPITAL, INC.

Submitted: May 10, 2007
Opinion Issued: August 9, 2007

Deborah A. Dent, by brief, *pro se.*

*Devine, Millimet & Branch, PA,* of Manchester (*Elaine M. Michaud* and *Brian R. Moushegian* on the brief), for the defendant.

GALWAY, J. The plaintiff, Deborah Dent, administratrix of the Estates of Helen M. Folloni and Lawrence F. Folloni, appeals an order of the Superior Court (*McHugh,* J.), granting summary judgment to the defendant, Exeter Hospital, Inc., and denying the Follonis' motion to amend their writ and add experts. We affirm.

The following facts are undisputed by the parties. On March 15, 2000, Helen Folloni arrived at Exeter Hospital exhibiting speech difficulty, confusion, and other mentally related afflictions. During her admission process, her husband, Lawrence Folloni, signed a form entitled "Consent for Diagnostic Services, Treatment and Release of Information" on behalf of his wife. The form stated, in pertinent part: "I understand that the Licensed Independent Practitioners (i.e. physicians) on the hospital's Medical Staff are not employees or agents of the hospital, but independent contractors who have been granted the privilege to use certain of its facilities for the care and treatment of their patients." Multiple physicians attended to Helen Folloni and the final diagnosis was that she had suffered a transitory ischemic attack, rather than a stroke. She was prescribed a blood thinner and was discharged from the hospital on March 16.

On March 24, Helen Folloni returned to Exeter Hospital with symptoms including weakness, dizziness, slurred speech, and confusion. During her

admission process, her son, Robert Folloni, signed on her behalf the same consent form previously signed by her husband. Physicians at Exeter Hospital diagnosed her as having a stroke and conducted tests. Under the care of multiple physicians at Exeter Hospital, her condition deteriorated until she was transferred to Massachusetts General Hospital, where she was diagnosed with a brain hemorrhage and underwent surgery. She survived the surgery, but with significant brain damage.

In March 2003, Helen and Lawrence Folloni (the Follonis) brought a medical malpractice action against Exeter Hospital, Exeter Family Medical Associates, and three doctors who treated Helen Folloni during her two visits to Exeter Hospital. Count five of the writ claimed that Exeter Hospital was vicariously liable for the alleged malpractice of physician defendants under the doctrine of respondeat superior. Count six claimed that Exeter Hospital breached its duty to maintain and enforce rules and procedures that ensured appropriate care for patients by failing to ensure that Helen Folloni was referred to a neurologist for treatment during her March 15 admission.

In April 2003, Exeter Hospital filed a motion for summary judgment on counts five and six. As to count five, the hospital argued that the three defendant doctors were not agents of Exeter Hospital, for reasons including the following: (1) two of the doctors were employed by Exeter Family Medical Associates, a professional association independent from Exeter Hospital, and one was a solo practitioner; (2) direct medical treatment provided by the physicians was performed based upon their individual expertise, not based upon oversight by Exeter Hospital; (3) care provided by the three physicians to Helen Folloni, as well as to their other patients, was billed to the physicians' individual practices, not Exeter Hospital; (4) prior to each of her admissions to Exeter Hospital, Folloni's representative signed a consent form acknowledging that the physicians on staff at Exeter Hospital were independent contractors, not employees or agents of the hospital; and (5) Folloni's primary care physician was one of the defendant doctors, and the Folloni family chose to take Helen Folloni to Exeter Hospital because they knew that this physician would treat her there. As to count six, Exeter Hospital argued that the plaintiffs did not have the requisite expert testimony to support such a claim.

Later in April, the Follonis filed a memorandum of law in opposition to the motion for summary judgment. They argued that Exeter Hospital exerted control over the defendant physicians, and thus acted as their principal in an agency relationship. To support this claim, the Follonis noted the hospital's compliance with the Joint Commission for Accreditation of Healthcare Organizations, which required Exeter Hospital to: (1) screen all physicians before granting them staff privileges

to ensure that they are licensed and restrict their practices to the confines of their licenses; and (2) maintain an ongoing quality assurance program to monitor the quality of patient care and the performance of staff physicians. They also relied upon policies set forth by Exeter Hospital, including: (1) the "Continuum of Care Policy," which required physicians in the hospital to report their absences from the hospital premises and provide patient coverage and make a minimum of hospital rounds each day to treat patients; and (2) the "Management of Information Policy and Procedure," which required physicians to record the type of service they perform and the manner in which they prepare records. The Follonis further noted agreements that the hospital had with its doctors. They produced evidence of agreements between the hospital and doctors in the emergency and radiology departments, which required physicians to: (1) meet the credentialing requirements of the hospital's medical staff; (2) comply with state and federal licensing requirements; (3) annually submit a schedule of physician fees; and, for the emergency physicians, (4) provide a certain number of hours of work for the hospital; and (5) provide services to every patient who arrived in the emergency department needing treatment, with some exceptions. The Follonis also produced evidence of two agreements, each signed by one of the defendant doctors. The first authorized one doctor to use hospital space and equipment to interpret electroencephalograms at Exeter Hospital and provided for him to receive a fee from the hospital for his work. The second agreement was for one doctor to interpret electrocardiogram (EKG) results for the hospital's patients. This agreement required the doctor to maintain active membership on the medical staff of the hospital, comply with state and federal licensing requirements and maintain insurance. It also provided that the hospital would be responsible for billing all charges related to the EKG services and paying the doctor for those services.

The Follonis also argued that Exeter Hospital was vicariously liable for the doctors' negligence under the doctrine of apparent authority. They alleged that certain facts showed apparent authority, such as: (1) Exeter Hospital provided the premises in which the physicians worked; (2) the hospital's advertising "lumps all of its privileged physicians together in a single 'Core Physician Services' Division" and "embraces them as part of its operation, e.g., 'Exeter Hospital's Emergency Department,' 'Exeter Hospital's Internal Medicine Physicians'"; and (3) physicians working at Exeter Hospital wore badges displaying the hospital's name.

Finally, the Follonis argued that they had ample evidence of Exeter Hospital's direct liability under the "enterprise theory," proof of which does not require expert testimony. The enterprise theory, the Follonis argued, recognizes that hospitals and physicians band together to provide

services and contain costs; such banding together was evident in this case and, thus, supplied evidence of Exeter Hospital's direct liability.

In June, the Follonis filed a motion to amend their writ by adding a claim that Exeter Hospital was negligent under respondeat superior because a radiologist at Exeter Hospital misinterpreted the results of a test done on Helen Folloni, and to add expert witnesses to their witness list.

The trial court granted the motion for summary judgment and denied the motion to amend the writ and add experts. On count five, the trial court ruled that the physicians who treated Helen Folloni were independent contractors; thus, Exeter Hospital could not be vicariously liable for their negligence. The court based this ruling upon, *inter alia*, that all decisions regarding patient diagnosis and treatment remained exclusively with the physicians and that Lawrence Folloni and Robert Folloni signed the hospital's consent form as persons authorized to consent for Helen Folloni. This authority was not contested before the trial court. On count six, the trial court ruled that the plaintiffs could not maintain their direct negligence claim against the hospital because they failed to satisfy New Hampshire's requirement that expert testimony support such a claim. The two experts disclosed by the plaintiffs offered no opinion upon the hospital's negligence through its personnel, the trial court found. Finally, the court denied the motion to amend the writ and add new experts because, *inter alia*, the motion came too late in the proceedings, would call for different evidence, and would prejudice the defendants.

Dent, as administratrix of the Follonis' estates, appeals the trial court's order, challenging each of the court's three rulings. We address each issue in turn.

## I. Vicarious Liability

Dent first argues that the trial court erred in granting summary judgment to Exeter Hospital because the Follonis adduced sufficient evidence from which a reasonable juror could have found that the hospital exercised control over its physicians and was otherwise their employer. Dent also argues that the trial court erred in ruling that the physicians did not have apparent authority to act on behalf of Exeter Hospital. Finally, Dent argues that the trial court erred in not allowing the jury to determine whether Exeter Hospital owed a non-delegable duty to Helen Folloni; Exeter Hospital contends that this issue is not preserved for appellate review.

When reviewing a trial court's grant of summary judgment, we consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the non-moving party. *VanDeMark v.*

*McDonald's Corp.*, 153 N.H. 753, 756 (2006). If our review of the evidence does not reveal any genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law, we will affirm the trial court's decision. *Id.* An issue of fact is "material" for purposes of summary judgment if it affects the outcome of the litigation under the applicable substantive law. *Id.* We review the trial court's application of the law to the facts *de novo. Tech-Built 153 v. Va. Surety Co.*, 153 N.H. 371, 373 (2006).

Whether an agency relationship has been established is a question of fact. *VanDeMark*, 153 N.H. at 760. An agency relationship, or lack thereof, does not turn solely upon the parties' belief that they have or have not created one. *Id.* "Rather, the necessary factual elements to establish agency involve: (1) authorization from the principal that the agent shall act for him or her; (2) the agent's consent to so act; and (3) the understanding that the principal is to exert some control over the agent's actions." *Id.* at 760-61. The granting of actual authority and consent to act with such authority may be either express or implied from the parties' conduct or other evidence of intent. *Herman v. Monadnock PR-24 Training Council*, 147 N.H. 754, 758-59 (2002). Control by the principal does not mean actual or physical control at every moment; rather, it turns upon the principal manifesting some continuous prescription of what the agent shall or shall not do. *Id.* at 759. Like actual authority, a finding of apparent authority incorporates the three factual elements listed above and "exists where the principal so conducts itself as to cause a third party to reasonably believe that the agent is authorized to act." *Boynton v. Figueroa*, 154 N.H. 592, 604 (2006) (quotation omitted).

In the case before us, the evidence presented fails to show an agency relationship, either actual or apparent. Considering actual agency, the trial court aptly observed that the policies cited by the Follonis, such as the "Continuum of Care Policy," were administrative in nature and did not instruct the physicians on how to care for their patients. Decisions regarding the diagnosis and treatment of patients remained exclusively with the doctors. Further, the undisputed facts that the doctors were either self-employed or employed by associations not part of Exeter Hospital and that the bills for services performed by these physicians went to them, rather than the hospital, provides further support for the trial court's ruling.

Dent argues that significant evidence of an agency relationship was before the trial court, such as the control evidenced in the written agreements that Exeter Hospital has with its physicians in the emergency and radiology departments. As the hospital points out, however, these agreements do not apply to the three defendant physicians, because they

are an internist, a family practitioner, and a neurologist who did not practice in either the emergency or radiology departments. Further, the agreements were between Exeter Hospital and various professional associations of physicians, designated in the contracts as the "Contractor," and they clearly stated that "there shall be no direct contractual relationship between Hospital and Contractor's Physicians . . . ." Additionally, the agreement between one of the defendant doctors and Exeter Hospital contracting for services interpreting EKG's specifically stated that the doctor was an independent contractor and not a hospital employee.

Dent relies upon our holding in *Petition of City Cab of Manchester*, 139 N.H. 220, 221 (1994), to support her argument that whether the doctors were independent contractors or employees of the hospital requires consideration of many factors, and the trial court focused too narrowly on the "control" prong of the agency test. In *City Cab*, however, the question before us was not whether an agency relationship existed, but whether a taxi service had to secure workers' compensation for its taxi drivers. *City Cab*, 139 N.H. at 220. In that case, we held that "[w]e determine the existence of an employee-employer relationship *for the purposes of workers' compensation* through reference to the factors set forth in the New Hampshire Department of Labor regulations." *Id.* at 221 (emphasis added). We then listed and considered eleven factors and determined that the cab drivers were employees of the taxi service and were entitled to workers' compensation. *Id.* at 221-23.

The instant case does not present a question of workers' compensation. Instead, the question before us is whether an agency relationship existed for purposes of vicarious liability. We have consistently used the three-pronged test described above to determine whether an agency relationship exists. *See VanDeMark*, 153 N.H. at 760-61; *Boynton*, 154 N.H. at 604; *Herman*, 147 N.H. at 758. Accordingly, we decline Dent's invitation to employ the workers' compensation test in the instant case.

As for apparent authority, both of Helen Folloni's visits to Exeter Hospital began with one of her authorized representatives signing a form that expressly stated, "I understand that the Licensed Independent Practitioners (i.e. physicians) on the hospital's Medical Staff are not employees or agents of the hospital, but independent contractors who have been granted the privilege to use certain of its facilities for the care and treatment of their patients." Although such disclaimers are not automatically dispositive on the issue of apparent authority, they are important factors to consider in the analysis. *See James by James v. Ingalls Memorial Hosp.*, 701 N.E.2d 207, 210-11 (Ill. App. Ct. 1998), *appeal denied*, 707 N.E.2d 1239 (Ill. 1999). It is difficult for any patient

whose authorized representatives signed such a form to claim that he or she reasonably believed that the hospital authorized the physician to act on its behalf. *See id.* at 211.

Further, Dent alleges little evidence of actions by Exeter Hospital that would indicate apparent authority. She argues that the defendant physicians had offices on Exeter's premises, wore Exeter's identification badges, and relied upon Exeter's specialists for consultations; however, the focus of the apparent-authority inquiry is upon the representations of the alleged principal, not the alleged agent. *See Boynton,* 154 N.H. at 604; *see also Daniel Webster Council v. St. James Assoc.,* 129 N.H. 681, 683 (1987); *Fletcher v. South Peninsula Hospital,* 71 P.3d 833, 841 (Alaska 2003). As for the representations of Exeter Hospital, Dent argues that an advertisement from the hospital "lumps all physicians into a single category entitled 'Core Physician Services' Division, refers to them as if they were its employees, and repeatedly embraces physicians as part of its operation . . . ." The referenced advertisements, however, reveal no instance in which the physicians are referred to as employees.

▇ Viewing the above evidence in the light most favorable to Dent, we cannot conclude that there was sufficient evidence to establish either actual or apparent authority as between Exeter Hospital and the defendant physicians.

As to Dent's argument regarding non-delegable duty, we agree with Exeter Hospital that the plaintiffs did not raise this issue before the trial court. Dent argues that the non-delegable duty theory was subsumed within the vicarious liability claim in the original writ filed by the Follonis. Our review of the writ, as well as the remainder of the record, reveals that no such argument was developed, however. We have consistently held that we will not consider issues raised on appeal that were not presented in the trial court. *LaMontagne Builders v. Bowman Brook Purchase Group,* 150 N.H. 270, 274 (2003). As the appellant, Dent bears the burden not only of providing a record sufficient for our review, but also of demonstrating that issues raised on appeal were first raised before the trial court. *See McKenzie v. Town of Eaton Zoning Bd. of Adjustment,* 154 N.H. 773, 776 (2007); SUP. CT. R. 16(3)(b). Because Dent has failed to show that the issue of non-delegable duty was raised before the trial court, we conclude that this issue is not preserved for appeal and decline to review it. *See McKenzie,* 154 N.H. at 776.

## II. Direct Negligence

Dent next argues that the trial court erred in granting Exeter Hospital's motion for summary judgment based, in part, upon the Follonis' failure to

produce expert testimony in support of the claim. She argues that the hospital is liable for its failure to supervise and train Helen Folloni's treating physicians, its failure to promulgate and enforce certain policies and procedures, and its adoption of certain cost-containment policies, such as having MRI equipment available only part-time. These allegations do not involve medical decisions, Dent argues, and, therefore, no expert is required. Exeter Hospital responds that the Follonis failed to meet their burden under RSA 507-E:2 (1997) of providing expert testimony.

We review a trial court's interpretation of a statute *de novo*. *In the Matter of Giacomini & Giacomini*, 151 N.H. 775, 776 (2005). We are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. *Id.* We first examine the language of the statute, and, where possible, ascribe the plain and ordinary meanings to the words used. *Id.* When a statute's language is plain and unambiguous, we need not look beyond it for further indication of legislative intent, and we refuse to consider what the legislature might have said or add language that the legislature did not see fit to incorporate in the statute. *Id.* at 776-77.

RSA 507-E:2 provides, in pertinent part:

I. In any action for medical injury, the plaintiff shall have the burden of proving by affirmative evidence which must include expert testimony of a competent witness or witnesses:

(a) The standard of reasonable professional practice in the medical care provider's profession or specialty thereof, if any, at the time the medical care in question was rendered; and

(b) That the medical care provider failed to act in accordance with such standard; and

(c) That as a proximate result thereof, the injured person suffered injuries which would not otherwise have occurred.

Although Dent attempts to characterize the negligence claim as beyond RSA 507-E's purview, the definitions in the statute provide otherwise. RSA 507-E:1 (1997) defines the following terms:

I. "Action for medical injury" means *any action* against a medical care provider, whether based in tort, contract or otherwise, to recover damages on account of medical injury.

II. "Medical care provider" means a physician, physician's assistant, registered or licensed practical nurse, *hospital*, clinic or other health care agency licensed by the state or otherwise lawfully providing medical care or services . . . .

III. "Medical injury" or "injury" means any adverse, untoward or undesired consequences arising out of or sustained in the course of professional services rendered by a medical care provider, whether resulting from negligence, error, or omission in the performance of such services . . . .

(Emphasis added.)

█ Under the above definitions, the Follonis' negligence action against Exeter Hospital fits within the definition of "action for medical injury": hospitals are explicitly included in the definition of "medical care provider," and the plaintiffs alleged a "medical injury," as they alleged that Helen Folloni suffered an "adverse consequence arising out of or sustained in the course of professional services rendered by" Exeter Hospital. Accordingly, the Follonis' claims fall squarely within the purview of RSA 507-E:2, which requires expert testimony for "any action for medical injury." As the trial court correctly concluded that Exeter Hospital was entitled to judgment as a matter of law on this issue, we affirm the trial court's ruling. Based upon this conclusion, we decline to address Dent's argument regarding the "enterprise theory" of liability.

*III. Amended Writ*

The final issue on appeal is whether the trial court unsustainably exercised its discretion by denying the Follonis' motion to amend their writ and add experts. The Follonis moved to add a claim that Exeter Hospital was negligent under the doctrine of respondeat superior because a radiologist at Exeter Hospital misinterpreted the results of a test done on Helen Folloni. Dent argues that all parties had, throughout the course of the litigation, "missed virtually every court or rule-imposed deadline," that all "parties were in a collective state of unreadiness for trial," and that the trial court's strict ruling was thus unfair and prejudicial to the Follonis. Exeter Hospital argues that the trial court's ruling was proper, particularly because the amendment would have required additional discovery regarding the claim and the expert witnesses.

█ Under RSA 514:9 (2007), a trial court may permit a substantive amendment to pleadings "in any stage of the proceedings, upon such terms as the court shall deem just and reasonable, when it shall appear to the court that it is necessary for the prevention of injustice . . . ." Accordingly, liberal amendment of pleadings is permitted unless the changes would surprise the opposing party, introduce an entirely new cause of action, or call for substantially different evidence. *Bel Air Assocs. v. N.H. Dep't of Health & Human Servs.*, 154 N.H. 228, 236 (2006). Although amendment

of pleadings is liberally permitted, the decision to grant or deny a motion to amend rests in the sound discretion of the trial court. *Id.* We will not overturn that decision unless it is an unsustainable exercise of discretion. *Id.*

In its order, the trial court denied the Follonis' motion to amend and add experts because, *inter alia*, they appeared to be capitalizing on a continuance that the trial court granted due to a medical emergency experienced by Lawrence Folloni. The trial court had postponed the May 9, 2005 trial date to June 6, 2005, because of this medical emergency. The court then postponed the trial to October, because the defendants' medical experts could not make the June 6 date. On June 8, the Follonis filed their motion to amend and add experts. In its ruling on the motion, the trial court stated, "[T]he request ... is able to be made only because of the fortuity of the plaintiff's illness which caused the May trial to be continued." The trial court found that allowing the amendment would require significant new evidence and, given that the request came after the close of discovery, would cause prejudice to the defendants.

It is clear that deposing multiple expert witnesses would require not only substantially new evidence, but also significantly more discovery. The trial court had closed discovery by the date of the request. Dent argues that discovery was not closed by June 6; however, she cites no evidence to support this assertion. Given the broad discretion that trial courts enjoy in the management and supervision of pretrial discovery, *see Blagbrough Family Realty Trust v. A&T Forest Prods.*, 155 N.H. 29, 40 (2007), we see no reason to rule that the trial court erred by holding to its discovery deadline. Accordingly, we affirm the trial court's denial of the Follonis' motion.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, DUGGAN and HICKS, JJ., concurred.