Belknap
No. 2009-672

REBECCA L. COAN *& a.*

v.

NEW HAMPSHIRE DEPARTMENT OF ENVIRONMENTAL SERVICES *& a.*

Argued: May 13, 2010
Opinion Issued: October 19, 2010

*Douglas, Leonard & Garvey, P.C.*, of Concord (*Benjamin T. King* on the brief and orally), for the plaintiffs.

*Michael A. Delaney*, attorney general (*Evan J. Mulholland*, assistant attorney general, on the brief and orally), for defendant New Hampshire Department of Environmental Services.

*McLane, Graf, Raulerson & Middleton, P.A.*, of Manchester (*Mark C. Rouvalis* and *Michael J. Kenison* on the brief, and *Mr. Rouvalis* orally), for defendant Algonquin Power Systems, Inc.

BRODERICK, C.J. The plaintiffs, Rebecca L. Coan and Micah Ciampi, co-administrators of the estate of Nicholas M. Lorette and parents of Jeffrey Lorette, and Sharon Ciampi, administratrix of the estate of Michael T. Squeglia, appeal orders of the Superior Court (*McGuire*, J.) dismissing their lawsuit for wrongful death, negligence and negligent infliction of

emotional distress, brought against the defendants, the New Hampshire Department of Environmental Services (DES) and Algonquin Power Systems, Inc. (Algonquin), and denying their motion to amend their writ. We affirm.

The following facts derive either from the plaintiffs' allegations, which we accept as true for the purposes of this appeal, or from the trial court's orders. On June 12, 2005, the decedents, Nicholas, age sixteen, and Michael, age twenty, and Nicholas's nine-year-old brother, Jeffrey, went swimming in Silver Lake in Belmont. Silver Lake is located downstream from Lochmere Dam; DES owns the dam and uses it to control water resources in the Winnipesaukee watershed. The dam also is part of a hydroelectric generating facility, which is owned by HDI I Associates Partnership (HDI). HDI leases operation of the hydroelectric generating facility to Algonquin.

Local residents use Silver Lake for swimming. The boys frequently swam in the lake and had just done so the day before. Despite their familiarity with the lake, the boys did not know that on the afternoon of June 11, 2005, defendant DES added 375 cubic feet per second to the flow coming out of Lochmere dam into the lake, which made the currents in the north end of the lake deadly. Although the defendants knew that people swam downstream from the dam and that swimming there could become dangerous when flow from the dam was increased, neither posted any warnings about the dangers of swimming in the north end of the lake, downstream from the dam. Nor did either defendant place any safety devices on the lakeshore.

While swimming in the lake, Jeffrey became caught in the deadly currents near the mouth of the river and screamed for help. Nicholas and Michael raced to his aid, but were also caught in the currents. A nearby resident was able to save Jeffrey in his kayak, but Nicholas and Michael drowned.

The plaintiffs sued the defendants in October 2007, and, in February 2009, filed their first amended writ. The defendants filed motions to dismiss, which the trial court granted. Although the plaintiffs sought to amend their writ again, the trial court denied their motion to amend, and this appeal followed.

In reviewing a trial court's grant of a motion to dismiss, our task is to determine whether the allegations in the writ are reasonably susceptible of a construction that would permit recovery. *Berry v. Watchtower Bible & Tract Soc.*, 152 N.H. 407, 410 (2005). We assume all facts pleaded in the writ to be true and construe all reasonable inferences drawn from those facts in the plaintiffs' favor. *Id.* We then engage in a threshold inquiry that tests the facts in the writ against the applicable law, and if the allegations constitute

a basis for legal relief, we must hold that it was improper to grant the motion to dismiss. *In the Matter of Lemieux & Lemieux*, 157 N.H. 370, 373 (2008).

We first address whether the trial court erred by dismissing the plaintiffs' claims against DES. The trial court ruled that DES was entitled to recreational use immunity under RSA 212:34 (Supp. 2009) and RSA 508:14, I, (2010). Because we conclude that the trial court did not err by finding DES immune from liability under RSA 508:14, I, we do not address the parties' arguments concerning RSA 212:34.

We are the final arbiters of the intent of the legislature as expressed in the words of the statute considered as a whole. *Estate of Gordon-Couture v. Brown*, 152 N.H. 265, 266 (2005). We first examine the language of the statute, and, where possible, ascribe the plain and ordinary meanings to the words used. *Id.* We review the trial court's statutory interpretation *de novo*. *Id.* Statutes, such as RSA 508:14, I, which are in derogation of the common law right to recover, are to be strictly construed. *See id.* at 266-67.

RSA 508:14, I, provides:

> An owner, occupant, or lessee of land, including the state or any political subdivision, who without charge permits any person to use land for recreational purposes or as a spectator of recreational activity, shall not be liable for personal injury or property damage in the absence of intentionally caused injury or damage.

The plaintiffs do not dispute that RSA 508:14, I, applies to State-owned land. Accordingly, we assume, without deciding, that RSA 508:14, I, so applies.

The plaintiffs first argue that RSA 508:14, I, does not apply here because it extends to injuries and recreational activity that occur on the ground, but not to those occurring in water. *See Kantner v. Combustion Engineering*, 701 F. Supp. 943, 946 (D.N.H. 1988). As primary support for this argument, the plaintiffs rely upon *Kantner*, in which the Federal District Court of New Hampshire "declined on this basis to apply RSA 508:14, I, to claims brought on behalf of two men who drowned while swimming and canoeing at the base of a dam." *Collins v. Martella*, 17 F.3d 1, 3 n.2 (1st Cir. 1994), *disagreed with on other grounds by Estate of Gordon-Couture*, 152 N.H. at 274-75. The *Kantner* court explained that RSA 508:14, I, did not apply because "[t]he decedents were swimming and canoeing in a river and were not *using* land for recreational purposes." *Kantner*, 701 F. Supp. at 946; *see* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1268 (unabridged ed. 2002) (first definition of "land" is "the solid part of the surface of the earth in contrast to the water of oceans and seas"). *But see Collins*, 17 F.3d

at 3 n.2 (distinguishing *Kantner* because Collins, unlike decedents in *Kantner*, accessed water from land owned by defendant).

The State counters that the plain meaning of the word "land" is "property," which includes both ground and water. *See* BLACK'S LAW DICTIONARY 955 (9th ed. 2009) ("In its legal significance, 'land' is not restricted to the earth's surface, but extends below and above the surface. Nor is it confined to solids, but may encompass within its bounds . . . liquids." (quotation omitted)). We need not resolve whether the word "land" as used in RSA 508:14, I, refers only to ground or includes water because even if it refers only to ground, we conclude that RSA 508:14, I, applies to this case.

■ Contrary to the plaintiffs' assertions, the plain language of RSA 508:14, I, strictly construed, does not require that the injury at issue actually occur on the ground or in a structure on the ground, as opposed to in the water. Immunity under RSA 508:14, I, is available whenever a landowner makes his or her land available to the general public to use for recreational activities or for watching recreational activities, free of charge. *See Soraghan v. Mt. Cranmore Ski Resort*, 152 N.H. 399, 402-03 (2005). Even if the word "land" refers only to the ground, as long as the injured party used the landowner's land for recreational activities or to watch such activities, immunity is available, provided the other conditions of RSA 508:14, I, are met (the land is open to the general public and the landowner does not charge for access or use). *See id.* at 402-03. In *Collins*, for instance, the First Circuit Court of Appeals concluded that RSA 508:14, I, applied because Collins gained access to the defendants' shallow pond from a dock installed on their beach. *Collins*, 17 F.3d at 3 n.2.

■ On this point, we find *Collins* instructive. The boys in this case gained access to the water by using land owned by the State. The boys' purpose for accessing Silver Lake was to swim; no one disputes that, in this case, the boys' swimming was a recreational · activity. *Cf.* RSA 212:34, I ("water sports" is recreational activity for which recreational use immunity is available under RSA 212:34). Thus, even if the word "land" pertains only to the ground, because the boys used State-owned land for recreational activities, *i.e.*, to access water for swimming, we hold that RSA 508:14, I, applies to this case.

The plaintiffs next assert that RSA 508:14, I, does not apply "because the State did not 'permit' Nicholas, Michael and Jeffrey to access Silver Lake through its land, even if the State in fact does own the land the boys crossed to enter the lake." *See Kenison v. Dubois*, 152 N.H. 448, 454 (2005) (to qualify as an "occupant" under RSA 508:14, I, one must at least have the ability or authority to permit persons to use or enter the land). The

plaintiffs contend that, because Silver Lake is a public body of water, Nicholas, Michael and Jeffrey "enjoyed a public easement to cross public non-fenced land" to enter the lake. The plaintiffs assert: "The State had no power to prevent the boys from crossing the land to exercise their common law rights to enjoy Silver Lake." As the plaintiffs explain: "Owning the land where the boys entered the water does not immunize the State from liability for creating the lethal condition that killed Nicholas and Michael and injured Jeffrey, where the boys held a public easement to traverse such land to exercise their common law rights to swim in Silver Lake."

█ The plaintiffs' argument is based upon their mistaken assumption that the State lacks authority to control access to public waters, such as Silver Lake, from public land. To the contrary, by statute, public waters (defined as "[a]ll natural bodies of fresh water situated entirely in the state having an area of 10 acres or more") are state-owned. RSA 271:20 (2010). The State "has an interest in protecting those waters and has the jurisdiction to control the use of the public waters *and the adjacent shoreland* for the greatest public benefit." RSA 483-B:1, II (2001) (emphasis added). While the public has certain common law rights, such as the common law right to boat recreationally on public waters, the public's rights are always subject to the paramount right of the State to control them reasonably in the interests of navigation, water storage and classification, health and other public purposes. *See Lakeside Lodge v. Town of New London,* 158 N.H. 164, 170 (2008) (referring to littoral owner rights); *Appeal of Comm. to Save the Upper Androscoggin,* 124 N.H. 17, 25 (1983) (rejecting argument that use of public lands is a "right" that lawfully elected representatives cannot alter for the public good). For instance, to protect the drinking water supply, the State may prohibit swimming in certain public waters altogether and preclude the public from engaging in any activity at all within a certain distance from a water supply intake structure. *See, e.g.,* N.H. ADMIN. RULES, Env-Ws 386.58(g) (regulations for protecting the purity of the Bellamy Reservoir and its watershed); *see also* RSA ch. 485 (2001 & Supp. 2009).

█ Having concluded that the trial court did not err by dismissing the claims against DES, we next address whether it erred when it ruled that Algonquin could not be liable to the plaintiffs because it had no duty to warn or place safety devices on shore. To prevail upon their negligence claims against Algonquin, the plaintiffs had to show that: (1) Algonquin owed the boys a duty; (2) Algonquin breached this duty; and (3) the breach proximately caused the deaths of Michael and Nicholas and the injuries to Jeffrey. *See Dupont v. Aavid Thermal Technologies,* 147 N.H. 706, 709

(2002). Whether a duty exists in a particular case is a question of law. *See Hungerford v. Jones*, 143 N.H. 208, 211 (1998).

The plaintiffs allege that Algonquin owed a duty to the boys and to the public to warn of the allegedly dangerous currents and to place safety devices on the lakeshore because it "knew or should have known that the area was a popular swimming area and that swimming conditions could be perilous in the vicinity of the dam and in the area adjacent to the [power] station." Additionally, the plaintiffs allege that Algonquin had a contractual duty to warn and place safety devices on shore that arose from its operating agreement for the Lochmere dam generating station.

■ We first address whether Algonquin owed a common law duty to protect the public and/or the boys. "In general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable [person] to protect them against an unreasonable risk of harm to them arising out of the act." RESTATEMENT (SECOND) OF TORTS § 302 comment *a* at 82 (1965); *see Walls v. Oxford Management Co.*, 137 N.H. 653, 656 (1993) ("A party who does not otherwise have a duty, but who voluntarily renders services for another, has been held to a duty of reasonable care in acting."). "The duties of one who merely omits to act are more restricted, and in general are confined to situations where there is a special relation between the actor and the other which gives rise to the duty." RESTATEMENT (SECOND) OF TORTS, *supra* § 302 comment *a* at 82.

■■ Here, the plaintiffs have alleged that Algonquin failed to act — it failed to warn the boys and the public about the dangers of swimming downstream from the power plant and failed to place safety devices on shore, despite its knowledge that swimming there could be dangerous. The plaintiffs have not alleged that there is any special relationship between Algonquin and the boys that would give rise to a duty to act. Moreover, Algonquin's alleged knowledge about the dangers of swimming in Silver Lake is insufficient to impose a duty upon Algonquin to act. The mere "fact that [an] actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." RESTATEMENT (SECOND) OF TORTS, *supra* § 314, at 116; *see Marquay v. Eno*, 139 N.H. 708, 716 (1995) ("As a general rule, a person has no affirmative duty to aid or protect another."). This rule applies "irrespective of the gravity of the danger to which the other is subjected and the insignificance of the trouble, effort, or expense of giving him aid or protection." RESTATEMENT (SECOND) OF TORTS, *supra* § 314 comment *c* at 116.

██ The plaintiffs contend that a special relationship between Algonquin and the boys is unnecessary. To support this contention, they rely upon RESTATEMENT (SECOND) OF TORTS § 302A, which provides: "An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the negligent or reckless conduct of the other or a third person." Their reliance upon RESTATEMENT (SECOND) OF TORTS § 302A is misplaced because it "is concerned only with the negligent character of the actor's conduct, and not with his duty to avoid the unreasonable risk." RESTATEMENT (SECOND) OF TORTS, *supra* § 302 comment *a* at 82; *see* RESTATEMENT (SECOND) OF TORTS, *supra* § 302A comment *a* at 86; RESTATEMENT (SECOND) OF TORTS, *supra* § 302B comment *a* at 89.

██ The plaintiffs also rely upon the comments to RESTATEMENT (SECOND) OF TORTS § 314, which explain that although an actor does not generally have the duty to take affirmative precautions to aid or protect another, such a duty may be imposed when the actor has control of a third person. RESTATEMENT (SECOND) OF TORTS, *supra* § 314 comment *a* at 116. The plaintiffs argue that they have alleged sufficient facts to support an inference that Algonquin had some control over DES's decision to increase the water flow through the dam. Accordingly, they contend, they have alleged sufficient facts to show that Algonquin had a duty to protect the boys and the public from danger by posting warnings and placing safety devices on shore.

██ The plaintiffs' writ, however, does not allege *any* relationship between Algonquin and DES. Nor does the writ allege that Algonquin had any role in the decision to release the dam water. The writ alleges only that DES "decided to add another 375 cubic feet per second to the flow coming out of the Lochmere dam into Silver Lake." Even assuming all of the facts pleaded in the writ to be true, and drawing all reasonable inferences from them in the plaintiffs' favor, we conclude that they are insufficient to establish that Algonquin had any control over DES's actions. *See In the Matter of Lemieux & Lemieux*, 157 N.H. at 372-73.

We next address whether Algonquin's operating agreement conferred a duty upon it to warn the boys and/or the public or to place safety devices on shore. The operating agreement between HDI and Algonquin provides:

> **SAFETY SERVICES**: Operator shall take precautions for the safety of personnel performing the Services and shall comply with applicable safety Laws and other safety requirements to prevent accidents or injury to persons or damage to that property on, about or adjacent to the Site and on which the Operator maintains control via limited access. Operator shall use its best efforts to

eliminate or abate safety hazards created by or ótherwise result-
ing from the performance of the Services.

This part of the agreement obliges Algonquin to, among other things,
"[m]aintain guards and barriers as needed for the protection of workers
and the public and post danger signs warning against any hazards on the
Site." Under the agreement, the "Site" is the site of the hydroelectric
generating facility. The "[s]ervices" to which this provision refers, are those
that are specifically described in three separate schedules. None of them
pertains to managing the water flow from the dam.

 Nothing in the plain language of this provision requires Algonquin
to warn the public about dangerous downstream conditions or to place
safety devices on the lakeshore. This provision obligates Algonquin to
protect personnel and to comply with applicable safety laws and other
safety requirements to prevent accidents or injury to people "on, about or
adjacent to" the hydroelectric facility. Even if the area where the boys were
swimming could be deemed to be "adjacent to" the hydroelectric facility,
the plaintiffs have not alleged any safety law or requirement that would
oblige Algonquin to warn the general public about dangerous lake condi-
tions or place safety devices on shore.

The provision also requires Algonquin to use its best efforts to eliminate
or abate safety hazards created or otherwise resulting from the perfor-
mance of the services it specifically contracted to perform. As the plaintiffs
have not alleged that any of these services relate in any way to managing
the water flow from the dam, the second sentence of this provision is
insufficient to require Algonquin to eliminate or abate the allegedly
dangerous currents resulting from the release of water from the dam, such
as by placing safety devices on shore. This is particularly true in light of the
plaintiffs' stipulation that the only water over which Algonquin had control
did not cause or contribute to the accident at issue.

Finally, we address whether the trial court erred when it denied the
plaintiffs' motion to amend their first amended writ. After the trial court
dismissed their first amended writ, the plaintiffs moved to add an allegation
that DES intentionally caused Jeffrey's injuries and the deaths of Nicholas
and Michael. The trial court denied the plaintiffs' motion to amend in part
because it viewed the allegation as a new cause of action and because it
found that to allow the plaintiffs to amend at such a late stage in the
proceedings would unfairly prejudice the defendants.

 RSA 514:9 (2007) allows the trial court to permit a substantive
amendment to pleadings "in any stage of the proceedings, upon such terms
as the court shall deem just and reasonable, when it shall appear to the

court that it is necessary for the prevention of injustice . . . ." Under RSA 514:9, liberal amendment of pleadings is permitted unless the changes would surprise the opposing party, introduce an entirely new cause of action, or call for substantially different evidence. *Dent v. Exeter Hosp.*, 155 N.H. 787, 796 (2007). Whether to allow a party to amend his or her pleadings rests in the sound discretion of the trial court. *Id.* at 796-97. We will not disturb the trial court's decision absent an unsustainable exercise of discretion. *Id.* at 797.

In this case, we cannot find that the trial court unsustainably exercised its discretion by denying the plaintiffs leave to amend. The plaintiffs proposed amending the writ, which sounded entirely in negligence, to add an intentional tort claim. This is a new cause of action. The plaintiffs sought this amendment only three months before trial, after the parties had conducted extensive pre-trial discovery. Under these circumstances, we cannot conclude that the trial court's decision was an unsustainable exercise of discretion.

Citing *ERG, Inc. v. Barnes*, 137 N.H. 186 (1993), the plaintiffs argue that they had an absolute right to amend their writ. Their reliance upon *ERG* is misplaced. In *ERG*, we held that before a trial court may dismiss a writ for failure to state a cause of action, the court must give the plaintiff an opportunity to amend the writ to correct perceived deficiencies. *ERG, Inc.*, 137 N.H. at 189. *ERG* gives the plaintiff an opportunity to correct perceived deficiencies in his or her *original* claims; it does not grant the plaintiff an absolute right to plead an entirely new cause of action.

*Affirmed.*

DALIANIS, DUGGAN and HICKS, JJ., concurred.