# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

**In Case No. 2017-0721, <u>Sandra Janvrin v. Federal National Mortgage Association & a.</u>, the court on July 11, 2019, issued the following order:**

Having considered the briefs and oral arguments of the parties, the court concludes that a formal written opinion is unnecessary in this case. The appellant, Sandra Janvrin, appeals an order of the Superior Court (<u>Wageling</u>, J.) denying her petition to enjoin the foreclosure sale of her home, and to set aside the mortgage held by appellee Federal National Mortgage Association (FNMA), and serviced by appellee PNC Mortgage, a division of PNC Bank, NA (PNC). We reverse and remand.

The pertinent facts are as follows. Janvrin's home, which she inherited unencumbered, is located in Salem. Janvrin has a tenth-grade education, is not experienced in financial matters, and, as of 2007, was unemployed, on medical disability, and receiving social security benefits. In 2007, Janvrin's son, William Brightman, and his children lived with his girlfriend, Angela Warren, in Warren's multi-unit home located in Haverhill, Massachusetts. In approximately July of 2007, Warren asked Janvrin to loan her $40,000 to pay an arrearage on Warren's mortgage, using Janvrin's home as collateral, and Janvrin orally agreed to take out a loan to do so. In furtherance of the loan, Janvrin provided Warren with her date of birth, social security number, and income information. On July 31, 2007, a loan application in Janvrin's name was submitted, presumably by Warren, to E-Loan, Inc., an internet-based lender. On August 8, 2007, Warren submitted false information regarding Janvrin's employment status and income. On August 9, 2007, E-Loan approved a loan in the amount of $100,000.

On August 10, 2007, Warren brought Janvrin to Pentucket Bank, where, in order to facilitate receipt of the loan proceeds, they added Janvrin's name to Warren's account. Because E-Loan was an internet-based lender, a power of attorney was necessary to provide the requisite authority for an agent to sign the loan documents on Janvrin's behalf. Therefore, while at the bank, Janvrin also signed a limited power of attorney, which was notarized by a bank employee. Janvrin, trusting Warren, did not read the document. Thereafter, Warren used the signed and notarized limited power of attorney to create a fraudulent limited power of attorney. In that document, Warren added the name of Janvrin's husband, Gary Janvrin, and forged both his and Janvrin's signatures on the altered document. Additionally, Janvrin's name was misspelled, her forged signature appeared on the signature lines for both the

principal and the agent, and the document specified that the closing was to occur in July 2007. By its terms, the fraudulent limited power of attorney authorized Thomas Betz, apparently affiliated with E-Loan in some manner, to act as agent for Janvrin and her husband in executing documents for a $100,000 loan.

On August 13, 2007, Betz executed the loan documents — an acknowledgement of attorney-in-fact, quit-claim deed, mortgage, and note — on behalf of Janvrin and her husband. On August 16, 2007, Janvrin again accompanied Warren to Pentucket Bank, where she signed duplicate copies of another limited power of attorney, each of which was notarized by a bank employee. Janvrin again did not read the documents. Thereafter, as before, Warren used the signed and notarized limited power of attorney to create a fraudulent limited power of attorney: she added Gary Janvrin's name, and forged both his and Janvrin's signatures. By its terms, this fraudulent limited power of attorney authorized a closing on August 13, 2007, and authorized Betz to act as agent for Janvrin and her husband in executing documents for a $100,000 loan. On September 6, 2007, E-Loan recorded the fraudulent August 16, 2007 limited power of attorney, along with the loan documents executed by Betz. Neither of the limited powers of attorney actually signed by Janvrin on August 10, 2007 and August 16, 2007 were introduced as evidence at trial.

On August 20, 2007, the loan proceeds, in the amount of $94,541.00, were deposited into the joint bank account at Pentucket Bank. Warren used the funds to pay off the arrearage on her mortgage and for other personal expenses. Janvrin did not receive any of the loan proceeds, nor was she aware that they had been deposited in the account.

On October 2, 2007, the first mortgage payment of $690.68 was made out of the joint account. In November 2007, when no further payments on the loan had been made, National City Mortgage Bank, the loan servicer, began calling Janvrin and sending her certified mail. However, Janvrin never opened the mail, and the calls were made to Warren's phone number. In early 2008, an individual purporting to be Janvrin negotiated a repayment plan with National City's legal counsel, Harmon Law Offices. On May 14, 2008, a forbearance agreement was signed by an individual who, the trial court found, was "purporting to be [Janvrin], but who was not [Janvrin]."

Prior to the execution of the forbearance agreement, on March 17, 2008, Janvrin's mortgage was assigned to FNMA. On approximately April 29, 2008, Janvrin learned that National City was planning to foreclose on her home. She contacted Harmon Law Offices, informed it that she was a victim of fraud, and asked what she needed to do to keep her home. Janvrin was told that, to stop the foreclosure, she needed to send the firm $3,941.22. On May 20, 2008, Janvrin did so, and National City suspended the planned foreclosure.

After her initial report of fraud to Harmon Law Offices, Janvrin continued to report the fraud to the firm, as well as to PNC — which, in October 2008, had acquired National City and begun servicing the loan.  As the trial court observed,

> [s]he frequently told the person who answered her telephone call that she was the victim of a fraud and that she believed someone was looking into it. . . .  [Janvrin] had few, if any, resources to obtain legal assistance, and she relied on a belief that once notified, PNC would locate the source of the fraud.  She attempted to alert the police, local courts, and Pentucket Bank of her claim of fraud.  She also attempted to garner assistance from an attorney, with little luck.

Janvrin continued to make payments on the loan, but, in November 2009, she notified PNC that she needed assistance.  On December 16, 2009, Janvrin and PNC entered into a forbearance agreement setting forth a modified repayment plan.  On July 10, 2010, in response to another request for assistance, the parties entered into a loan modification agreement.

Sometime between April and July 2012, Janvrin was visiting a family member who lived in Warren's home, and she discovered a box containing various documents related to the loan.  Among the documents in the box were limited power of attorney forms — both blank and bearing signatures.  Janvrin brought the box of documents to Attorney Ralph Stein.  Stein sent a letter to PNC notifying it of the fraud, and asserting that, due to the forged limited power of attorney, the loan was invalid and the mortgage was a nullity.  In response to Stein's letter, PNC reviewed the mortgage file, and found, inter alia, that there were signature and name spelling discrepancies on various loan documents, including the August 10, 2007 limited power of attorney and the May 14, 2008 forbearance agreement.  Nonetheless, on December 20, 2012, PNC responded to Stein's letter, stating that Janvrin would not be excused from the loan as she had "reaffirmed her obligation to pay the loan in full in the Loan Modification Agreement."

On January 26, 2015, PNC sent a letter to Janvrin informing her that her mortgage was delinquent, and that, to avoid foreclosure, she could choose to enter into a new trial loan modification agreement, sell her home, or execute a deed-in-lieu of foreclosure.  On February 6, 2015, Janvrin signed the new trial loan modification agreement.  According to PNC, as of February 2015, Janvrin owed $102,687.08 in principal and interest on the loan, $8,146.08 more than the original disbursement in 2007.  On May 22, 2015, PNC offered her a new permanent loan modification agreement.  As of that date, more than seven years after the date of the original disbursement, Janvrin had made loan payments totaling $73,479.62.  Utilizing the assistance of Attorney Roger Phillips through the New Hampshire Foreclosure Relief Project, Janvrin

attempted to negotiate with PNC on a "compromised mortgage amount representing the $40,000.00 original loan to which [she] agreed [with Warren]" — but to no avail. In July 2015, after PNC and FNMA commenced foreclosure proceedings, Janvrin filed a petition in superior court to enjoin the foreclosure and set aside the mortgage. After a bench trial, the trial court denied her petition. This appeal followed.

On appeal, Janvrin argues that the trial court erred when it denied her petition because, she contends, the loan and mortgage were issued without her authorization and were, therefore, void. She also argues that the trial court erred when it concluded that she failed to adequately assert a request for equitable relief in her petition. PNC and FNMA counter that the trial court did not err when it denied Janvrin's petition. Further, they argue that, even if the loan and mortgage were invalid, Janvrin ratified them by signing the forbearance and loan modification agreements. We agree with Janvrin that the trial court erred, and remand for the trial court to further consider certain issues discussed below.

We first consider Janvrin's argument that the loan and mortgage were void because they were issued without her authorization. She contends that, because Betz only received the fraudulent limited powers of attorney, there was no agency relationship between her and Betz. "Whether or not authority exists for one person to act on another's behalf is a question of fact for the trial court, which we will not disturb unless the finding is not supported by the evidence or is erroneous as a matter of law." Patterson v. Tirollo, 133 N.H. 623, 627-28 (1990). "A trial court's finding is supported by the evidence if a reasonable person could have arrived at the same conclusion based on the evidence presented." Id. at 628.

"An agency relationship, or lack thereof, does not turn solely upon the parties' belief that they have or have not created one." Dent v. Exeter Hosp., 155 N.H. 787, 792 (2007). "Rather, the necessary factual elements to establish agency involve: (1) authorization from the principal that the agent shall act for him or her; (2) the agent's consent to so act; and (3) the understanding that the principal is to exert some control over the agent's actions." Id. (quotation omitted). "An agency relationship exists only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act." Richardson v. Sibley, 101 N.H. 377, 379 (1958) (quotation omitted); see also Restatement (Second) of Agency § 7, cmts a-c, § 26, cmts a-c (1958). "The principal's manifestation need not be express to be valid; it may be oral or implied from the parties' conduct." Patterson, 133 N.H. at 627. Similarly, "[t]he granting of actual authority and consent to act with such authority may be either express or implied from the parties' conduct or other evidence of intent." Dent, 155 N.H. at 792. "Express authority arises when the principal explicitly manifests its authorization of the actions of its agent." Bouffard v. State Farm Fire & Cas. Co., 162 N.H. 305, 311 (2011)

4

(quotation and ellipsis omitted). "Implied authority, on the other hand, follows as a reasonable incident or construction of the terms of express authority, or results from acquiescence by the principal in a course of dealing by the agent." Id. at 311-12. "Such authority can arise from words used, from customs, or from the relations of the parties." Id. at 312. "The doctrine of implied actual authority focuses upon the agent's understanding of his authority: whether the agent reasonably believed, because of conduct of the principal (including acquiescence) communicated directly or indirectly to him, that the principal desired him so to act." Sinclair v. Town of Bow, 125 N.H. 388, 393 (1984) (emphasis omitted).

Janvrin contends that Betz was not authorized to act on her behalf in executing the loan documents because there was no "manifestation of authority" from her to Betz. She argues that, as a result of Warren's fraudulent actions, no limited power of attorney actually signed by her was ever transmitted to Betz — who only received the forgeries — and, therefore, because there was no "manifestation of authority," there was no agency relationship. PNC and FNMA first counter that this argument was not preserved. We disagree. Janvrin explicitly raised the argument to the trial court in her request for findings of fact and rulings of law. Although that alone was sufficient to preserve the issue for appeal, we also note that Janvrin explicitly raised the argument in her Opposition to PNC and FNMA's Motion in Limine to Exclude Evidence of Forgery. Furthermore, Janvrin also raised it through her argument that, due to the deficient and fraudulent limited powers of attorney, Betz was not authorized to act as her agent, and the loan and mortgage were void. This argument challenges the validity of the agency relationship, which necessarily requires a manifestation of authority from the principal to the agent. See Richardson, 101 N.H. at 379. Therefore, we conclude that Janvrin's manifestation argument was preserved.

Next, PNC and FNMA argue that Janvrin's manifestation argument fails because it is contrary to the trial court's findings that, even if Betz did not have express actual authority, "at a minimum, Mr. Betz had implied actual authority to bind [Janvrin] to the August 13, 2007 note and mortgage at the time that he executed those documents," because "Betz would have reasonably believed, because of [Janvrin's] conduct in signing the limited power of attorney, that [Janvrin] desired him to so act." (Quotations omitted.) PNC and FNMA contend that Janvrin cannot meet her burden to show that these findings are unsupported by the evidence. We disagree.

We first note, with regard to this argument, that the trial court found that Betz relied on the fraudulent limited powers of attorney when he purported to bind Janvrin to the loan and mortgage. This finding is evidenced by the trial court's statement that, "[b]y virtue of the doctored power of attorney document(s), on August 13, 2007, an acknowledgment of attorney-in-fact, quit-claim deed, mortgage, and note were executed by Thomas Betz on [Janvrin's]

and/or Gary Janvrin's behalf." (Emphasis added.) The fraudulent limited powers of attorney on their own — neither signed by Janvrin, nor acknowledged by a notary or other statutorily authorized person — could not have provided the requisite authority to Betz. See RSA 477:9 (2013) ("Every power of attorney to convey real estate must be signed and acknowledged.").

Nonetheless, PNC and FNMA contend that the trial court's finding of implied actual authority is supported by the fact that Janvrin did indeed sign limited powers of attorney on August 10, 2007 and August 16, 2007, both of which were notarized. However, as we have said: "An agency relationship exists only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act." Richardson, 101 N.H. at 379 (quotation omitted). Here, the record does not reflect that Betz ever received or became aware of the authentic limited powers of attorney. Rather, Warren interposed herself between the purported principal and agent — because of her fraud, no actual manifestation of authority from Janvrin ever reached Betz.

PNC and FNMA seek to overcome the lack of a manifestation by conflating the authentic limited powers of attorney actually signed by Janvrin with the fraudulent limited powers of attorney relied upon by Betz. Thus, PNC and FNMA urge us to defer to the trial court's conclusion that "the 'original' forms which [Janvrin] actually signed were materially identical to the forms which purport to bear Gary Janvrin's signature, except that Warren apparently added Gary Janvrin's name and forged signature to those forms, and further forged [Janvrin's] signature on the altered forms." Even if this conclusion were correct, it would not change our analysis — the limited powers of attorney relied upon by Betz were fraudulent, and the authentic limited powers of attorney were never manifested to Betz. See RSA 477:9; Richardson, 101 N.H. at 379.

We observe, as did the trial court, that "[t]he doctrine of implied actual authority focuses upon the agent's understanding of his authority: whether the agent reasonably believed, because of conduct of the principal (including acquiescence) communicated directly or indirectly to him, that the principal desired him so to act." Sinclair, 125 N.H. at 393 (quotation and emphasis omitted). However, we do not see how Betz could have reasonably believed, based on Janvrin's conduct, that he had been given such authority. The record does not reflect that Betz ever interacted, directly or indirectly, with Janvrin, his purported principal. Nor does it reflect that Betz was aware of any actual conduct by Janvrin. Although, as we have explained, Janvrin did sign limited powers of attorney, the record reflects that, due to Warren's fraudulent actions, Betz never received or became aware of them. Moreover, it would not have been reasonable for Betz to have relied on the August 10, 2007 limited power of attorney because Janvrin's name was misspelled, her (forged) signature appeared as both the principal and the agent, and it specified a

closing one month earlier, in July 2007. Indeed, the mere existence of the August 16, 2007 limited power of attorney suggests that E-Loan may well have had concerns about the facial validity of the August 10, 2007 limited power of attorney.

PNC and FNMA argue that, even if the August 10, 2007 limited power of attorney did not provide the requisite authorization, the August 16, 2007 limited power of attorney "authorized, affirmed, and ratified the execution of the loan documents by Betz." They base this argument on the trial court's finding that the August 16, 2007 limited power of attorney "arguably applied retroactively" to the earlier closing. However, because the August 16, 2007 limited power of attorney delivered to E-Loan three days after closing was the fraudulent one, not the one Janvrin actually signed, it could not have provided the requisite authorization through ratification. See DeRochemont v. Holden, 99 N.H. 80, 83 (1954) ("The law is well settled that effective ratification requires that the principal act with full knowledge of what the agent has done and with an intention to adopt his acts." (citation omitted)).

For the reasons set forth above, the trial court's finding that an agency relationship existed between Janvrin and Betz was both unsupported by the evidence and erroneous as a matter of law. See Patterson, 133 N.H. at 627-28. New Hampshire law requires that "[e]very deed or other conveyance of real estate shall be signed by the party granting same and acknowledged by the grantor before a justice, notary public or commissioner." RSA 477:3 (2013). Here, the loan documents were not signed by Janvrin, or signed on her behalf with her authorization; therefore, because there was no mutual assent between the parties, we hold that the loan documents were void ab initio. See RSA 477:3 (2013); 1 Richard A. Lord, Williston on Contracts § 3:4, at 284 (4th ed. 2007) (observing that where there is no mutual assent between the parties "there can be no contract"); Neuman v. Neumann, 971 N.Y.S.2d 322, 324 (N.Y. App. Div. 2013) ("Since the power of attorney was forged and, as a result, was void, the subject deed and mortgage are, therefore, also void."); Chase v. Ameriquest Mortgage Co., 155 N.H. 19, 22-23 (2007) (holding that a mortgage, which contained a forged signature and did not satisfy the statutory formalities of execution, could not constitute a charge on the homestead right).

PNC and FNMA also argue that, even if the original loan and mortgage were void, Janvrin ratified them when she signed the December 16, 2009 Forbearance Agreement, the July 10, 2010 Loan Modification Agreement, and the February 6, 2015 Trial Loan Modification Agreement, each of which contained provisions purportedly ratifying her obligations under the loan and mortgage. Although PNC and FNMA made this argument below, the trial court, having found that the loan and mortgage were valid, did not reach the issue of ratification.

Notably, the ratification argument advanced by PNC and FNMA presents us with an issue of first impression in New Hampshire: whether a loan and mortgage that have been held to be void <u>ab</u> <u>initio</u> can, in fact, be ratified. The authorities and courts are divided on this issue. <u>Williston on Contracts</u> provides that "if a promise is void, it creates no legal obligation and the promisor is without power to ratify [the] promise. A promisor may not bind him- or herself under a new promise to perform an antecedent void promise." 1 <u>Williston on Contracts</u> § 1:20, at 73-74; <u>see also</u> <u>Restatement (Second) of Contracts</u> § 163, cmt. <u>c</u> at 444 (1981) ("[T]he recipient of a misrepresentation may be held to have ratified the contract if it is voidable but not if it is 'void.'").

On the other hand, <u>Corbin on Contracts</u> states a contrary position: "In cases where the transaction of the parties is in fact a mutual agreement, but is legally void, and also in cases where there is no contract for the reason that there are no mutual expressions of assent, the parties may nevertheless follow the transaction by action that is itself legally operative." 1 Timothy Murray, <u>Corbin on Contracts</u> § 1.7, at 26 (rev. ed. 2018); <u>see also</u> Annotation, <u>Joining in instrument as ratification of or estoppel as to prior ineffective instrument affecting real property</u>, 7 A.L.R.2d 294, 302 (1949) ("Upon principles closely [analogous] to the law of agency, the unauthorized execution of an instrument affecting the title to land may be approved and adopted, or otherwise confirmed, by the owner thereof or of an interest in the land, through joinder in or execution of a subsequent instrument having that effect, expressly or by legal implication, through operation of ratification or estoppel, if the other essential elements are present."). The case law is similarly split. <u>Compare</u> <u>Hermes v. Title Guarantee & Trust Co.</u>, 24 N.E.2d 859, 860 (N.Y. 1939) (holding unassented to, fraudulent mortgage ratifiable), <u>and</u> <u>Humble Oil & Refining Co. v. Clark</u>, 87 S.W.2d 471, 474 (Tex. 1935) (holding void lease ratifiable), <u>with</u> <u>Wamsley v. Champlin Refining and Chemicals, Inc.</u>, 11 F.3d 534, 539 (5th Cir. 1993) (observing that void promises are not contracts and are not ratifiable), <u>and</u> <u>Yvanova v. New Century Mortg. Corp.</u>, 365 P.3d 845, 852 (Cal. 2016) (same).

Because the trial court found that the loan and mortgage were valid, it did not address ratification. For the same reason, the parties did not fully develop arguments regarding ratification in their appellate briefs. Accordingly, we remand for the trial court to consider this issue in the first instance. <u>See</u> <u>Huguelet v. Allstate Ins. Co.</u>, 141 N.H. 777, 780 (1997) (remanding for consideration of argument not decided by the trial court in the first instance).

If, on remand, the trial court determines that, as a matter of law, the loan and mortgage, which are void <u>ab</u> <u>initio</u>, can be ratified, the trial court will next consider whether the loan and mortgage were validly ratified by Janvrin. As part of that inquiry, the trial court will need to address any defenses to ratification that Janvrin might assert.

Finally, in the interest of judicial economy, we address the following issue because it is likely to arise on remand.  See Kelleher v. Marvin Lumber & Cedar Co., 152 N.H. 813, 847 (2005).  Janvrin argues that, because her petition is an equitable action under RSA 498:1, the trial court erred when it concluded that Janvrin failed to adequately assert a request for equitable relief in her petition.  PNC and FNMA counter that we should defer to the trial court's ruling, and that "a passing reference is not sufficient to properly raise this claim."  We agree with Janvrin.  In her petition, Janvrin invoked RSA 498:1, which provides that "[t]he superior court shall have the powers of a court of equity" in cases involving "fraud" and "the redemption and foreclosure of mortgages."  RSA 498:1 (2010).  Moreover, in her petition, Janvrin asserted that she was a victim of fraud, requested injunctive relief, and styled her initial pleading, in part, as a "Bill in Equity to Enjoin Foreclosure Sale."  See Chase, 155 N.H. at 23 (recognizing that a petition to enjoin a mortgage foreclosure initiated a case in equity and invoked the superior court's equitable powers).  Accordingly, we hold that the trial court's equitable powers have been properly invoked.

In light of our decision, we need not address the parties' remaining arguments.

Reversed and remanded.

LYNN, C.J., and HICKS, BASSETT, and DONOVAN, JJ., concurred.

**Eileen Fox,**
**Clerk**

9